No. 81-354

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

STATE EX REL., MONTANA WILDERNESS
ASSOCIATION, et al.,

                    Petitioner and Appellant,

    -vs-

BOARD OF NATURAL RESOURCES AND
CONSERVATION OF THE STATE OF MONTANA, et al.,

                    Respondents and Respondents.

Appeal from:   District Court of the First Judicial District,
               In and for the County of Lewis & Clark, The
               Honorable J. M. Salansky, Judge presiding.

Counsel of Record:

    For Appellant:

        Goetz, Madden & Dunn, Bozeman, Montana
        William L. Madden argued, Bozeman, Montana

    For Respondents:

        James F. Walsh, Pamela K. Merrell, Butte, Montana
        Donald MacIntyre argued, Dept. of Natural Resources,
        Helena, Montana
        Richard J. Andriolo argued, Bozeman, Montana
        Corette, Smith, Pohlman & Allen, Butte, Montana
        R. D. Corette, Jr., argued, Butte, Montana

    Amicus Curiae:

        Schulz, Davis & Warren, Dillon, Montana

                        Submitted:   December 2, 1981

                        Decided:   July 9, 1982

Filed:   JUL 9 - 1982

_____
                Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

The Board of Natural Resources & Conservation (BNRC) granted the Montana Power Company (MPC) permission to construct a 161 KV electrical transmission line from Bozeman to Ennis to Dillon with a 161 KV spur from Ennis to Big Sky. Montana Wilderness Association, Inc. (MWA) and Environmental Information Center, Inc. (EIC) appealed BNRC's decision to the District Court of Lewis & Clark County. The District Court affirmed. MWA and EIC now appeal the District Court decision to this Court.

On June 4, 1974, MPC filed with the Board an application for a Certificate of Environmental Compatibility and Public Need, pursuant to the provisions of the Utility Siting Act of 1973, seeking authorization for construction and operation of 155 miles of 161 KV electric transmission line extending from Clyde Park to a substation in the Upper Yellowstone Valley, then to Big Sky, and then to a substation outside of Dillon. Additionally, approximately 17 miles of 69 KV electric transmission line was proposed from the substation in the Upper Yellowstone Valley to Gardiner.

The Utility Siting Act was amended by the legislature effective April 21, 1975, and became known as the "Montana Major Facility Siting Act". On June 30, 1975, MPC filed an amended application requesting, in lieu of the lines previously sub-submitted, approval of 198 miles of transmission lines all of which were to be treated as one project or facility, con-sisting of the following:

    a)  Clyde Park to Emigrant--161 KV line;
    b)  Emigrant to Gardiner--69 KV line;
    c)  Clyde Park to Bozeman--161 KV line;
    d)  Bozeman to Ennis--161 KV line; and
    e)  Dillon to Ennis to Big Sky--161 KV line.

Pursuant to the mandates of the Montana Environmental Policy Act (MEPA) and the Siting Act (Section 75-20-216, MCA) the Department of Natural Resources and Conservation (Department) studied and evaluated the proposed facility and its effects. The Department published a draft environmental impact statement in

January of 1976 and, after reviewing comments from MPC, various government agencies and interested members of the public, the Department published its final EIS in April of 1976. The Department's recommendation was to approve the request except that construction of the 161 KV transmission line to Big Sky was to be routed from Bozeman to Big Sky through the Gallatin Canyon corridor, rather than from Ennis to Big Sky through Jack Creek/Cedar Creek Corridor.

On April 10, the first prehearing conference was held with Joe Sabol, a Bozeman attorney and Chairman of the Board, as hearings officer. On April 20, 1976, the Board commenced formal "certification proceedings" on the application, deeming the matter a contested case within the Montana Administrative Procedure Act (MAPA). Pretrial discovery and conferences followed and on May 7, 1976, MWA gave notice of its intent to become a party to the proceedings.

On May 12, the date of the second preconference hearing (also presided over by Sabol), MWA member Rick Applegate filed an affidavit of disqualification, requesting that Sabol disqualify himself from participating as a hearings officer and voting member of the Board. The reasons given for disqualification included charges that Sabol had previously publicly criticized the MWA (implicitly referring to an article which appeared on February 15, 1976, in the Bozeman newspaper) and that Sabol, being a paid legal representative of Ski Yellowstone, Inc. (a proposed resort whose future energy demands were likely to be an issue in the proceeding, according to the affidavit) could not render an impartial judgment. Sabol voluntarily withdrew as hearings officer on September 1, 1976, but refused to relinquish his voting position on the Board and the Board voted unanimously to deny the request that he be disqualified.

On September 23 and 24, public hearings were held before the Board where the prefiled written testimony of witnesses was

admitted, oral examination taken and exhibits supporting and opposing MPC's application introduced. According to the deposition of Donald MacIntyre (counsel for DNRC) and Applegate, Sabol spoke to MacIntyre in the lobby during one of the recesses and, according to Applegate, told MacIntyre not to examine MWA's witnesses because Madden (appellants' attorney) was building a record for appeal.

After the September hearings, the parties each filed proposed findings of fact and conclusions of law with appropriate exceptions thereto ⁻ ⁻ ⁻ filed by the opposing parties. Sabol's term on the Board terminated on December 31, 1976, and on April 21, 1977, the parties presented their final oral arguments to the Board. On October 28, 1977, the Board rendered its decision and granted the certificate to MPC, authorizing construction along the corridor preferred by MPC. Particularly, the Board found the Ennis-Jack Creek-Big Sky corridor to be preferable to the Ennis-Cedar Creek-Big Sky and Gallatin Canyon corridors, rejecting the Department's recommendation of using the Gallatin Canyon route.

On December 1, 1977, MWA and EIC filed a petition with the District Court of the First Judicial District, seeking review of that part of the Board's decision approving construction of the line from Bozeman to Ennis to Dillon, with a 161 KV spur from Ennis to Big Sky through the Jack Creek corridor. The segment of the line from Bozeman eastward has already been constructed and is not here in issue.

After various motions and the filing of extensive briefs by the parties, the trial court heard final arguments and deemed the case submitted on December 13, 1979. On July 14, 1981, the District Court entered an order disposing of all issues raised by MWA and EIC in favor of MPC. This appeal followed.

On August 7, 1981, MPC obtained from the Board an order approving centerline location for construction of the line.

Appellants, by motion dated August 10, 1981, applied to this Court for a stay of construction activities pending appeal and for an expedited briefing schedule. We denied the stay but granted an expedited briefing schedule.

The issues on appeal can be stated in this manner:

1. Are the environmental impact statements inadequate as a matter of law?

2. Are the Board's findings, conclusions and Certificate of Environmental Compatability and Public Need in conformity with statutory requirements and supported by the evidence?

3. Did Sabol's involvement deny MWA and EIC a hearing before a fair and impartial tribunal in violation of due process requirements?

At the outset, we must determine the proper standard of review of this appeal.

Our standard of review is governed by the Montana Administrative Procedure Act. Section 2-4-704, MCA, provides in part:

> "(2) The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> "(a) in violation of constitutional or statutory provisions;
>
> "(b) in excess of the statutory authority of the agency;
>
> "(c) made upon unlawful procedure;
>
> "(d) affected by other error of law;
>
> "(e) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record;
>
> "(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> "(g) because findings of fact, upon issues essential to the decision, were not made although requested."

- 4 -

Appellants urge that the scope of review based on the above statute is whether the draft and final environmental impact statements are "in violation of the constitutional or statutory provisions" or "affected by other error of law", citing section 2-4-704(2)(a) and (d), MCA, supra. Appellants also cite Trout Unlimited v. Morton (CCA 9, 1974), 509 F.2d 1276, for the assertion that appellate courts are not bound by the "clearly erroneous" standard that governs findings of an agency or trial court. In Trout Unlimited, supra, the federal appeals court said the following regarding the correct standard:

"The proper standard by which to review the

adequacy of the EIS has been the subject of some confusion in this court. The nature of the confusion has been whether the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the 'arbitrary, capricious, an[d] abuse of discretion' standard, or § 706(2)(D), the 'without observance of procedure required by law' standard or some third standard not precisely conforming to either § 706(2)(A) or § 706(2)(D) is the proper standard. See Environmental Defense Fund v. Armstrong, 487 F.2d 814 (9th Cir. 1973); Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973). This confusion was eliminated from our law by Lathan v. Brinegar, 506 F.2d 677 (9th Cir. 1974). We held that the § 706(2)(D) standard was the proper one because NEPA is essentially a:

"'procedural statute. Its purpose is to assure that, by following the procedures that it prescribes, agencies will be fully aware of the impact of their decisions when they make them. The procedures required by NEPA, 42 U.S.C.A. § 4332(2)(C), are designed to secure the accomplishment of the vital purpose of NEPA. That result can be achieved only if the prescribed procedures are faithfully followed; grudging pro forma compliance will not do. We think that the courts will better perform their necessarily limited role in enforcing NEPA if they apply § 706(2)(D) in reviewing environmental impact statements for compliance with NEPA . . .' Lathan v. Brinegar, supra, at 693." 509 F.2d at 1282.

We have previously discussed our scope of review of an agency decision under the Montana Administrative Procedure Act at some length in Northern Plains Resource Council v. Board of Natural Resources and Conservation (1979), 181Mont. 500, 594

P.2d 297, 36 St.Rep. 666. We emphasized how court review of agency decisions is limited:

> "This Court recently set forth three basic principles underlying section 82-4216 which a District Court must consider in determining what the scope of review of an administrative decision should be: (1) that limited judicial review of administrative decisions strengthens the administrative process by encouraging the full presentation of evidence at the initial administrative hearing; (2) judicial economy requires court recognition of the expertise of administrative agencies in the field of their responsibility; and (3) limited judicial review is necessary to determine that a fair procedure was used, that questions of law were properly decided, and that the decision of the administrative body was supported by substantial evidence. Vita-Rich Dairy, Inc. v. Department of Business Regulation (1976), 170 Mont. 341, 553 P.2d 980." 181 Mont at 509 , 594 P.2d at 303, 36 St.Rep. at 67.

We also quoted from the case of Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc. (1978), 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460:

> "' . . . the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review.

> "'"Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions." [Citation omitted.]' Vermont Yankee, 435 U.S. at 555, 98 S.Ct. at 1217. (Emphasis supplied.)" 181 Mont. at 511 , 594 P.2d at 304, 36 St.Rep. at 672.

We are not persuaded by appellants that we should move from our position taken in Northern Plains. It is an accurate statement of what kind of court review should be given to agency decisions. Furthermore, we note the mandates of the Montana review statute cited above (section 2-4-704(2), MCA) which contains a clear indication that the legislature intended that a court reverse or modify the lower decision where the agency decision is clearly erroneous, arbitrary, or capricious, resulting in the appellants' rights being substantially prejudiced.

- 6 -

With regard to the first issue on appeal, appellants claim the draft and final EIS's are inadequate as a matter of law on several grounds: the failure to consider the need for and alternatives to the proposed facility in the Upper Madison/Lower Ruby valleys and at Big Sky; the failure to consider the "no action" alternative; the failure to undertake an adequate cost/benefit analysis; and the contention that deficient Environmental Impact Statements cannot be rendered adequate by reference to the record outside the documents. We will consider each in turn.

Appellants first charge that the failure to consider the need for, and alternatives to, the facility in the Upper Madison/Lower Ruby valleys renders the EIS's legally inadequate. Chapter Three of the draft EIS discusses the need of the proposed facility and outlines the needs for the areas of Big Sky, Bozeman, Yellowstone National Park and the Yellowstone Valley. Chapter Four addresses alternative transmission methods generally and specific transmission alternatives to the four above areas. In neither chapter is there a discussion of the Upper Madison/Lower Ruby valleys. Appellants refer to several points in the record where this deficiency was noted by various individuals.

The Department, in its briefs to the District Court and to this Court, acknowledges that the EIS's contain no adequate consideration of alternatives to a 161 KV line serving the Upper Madison/Lower Ruby valleys. The Department justifies this omission by stating that MPC failed to comply with the Siting Act and the rules adopted pursuant thereto in identifying in MPC's application the need for a facility to serve the demand in the Upper Madison/Lower Ruby valleys.

It is true there is no separate section of the draft EIS devoted to consideration of alternatives to the proposed electrical transmission line serving the Upper Madison/Lower Ruby valley area. However, Chapter Three of the draft EIS contains sta-

- 7 -

tistics and data on the needs of the Upper Madison/Lower Ruby valley including regulation statistics, existing transmission line data, a map showing a significant growth in/irrigation [sprinkling] per-mit filings/constitute [which would]. additional electrical demand, a showing that Vigilante Electric Cooperative which uses MPC transmission lines in the area projects almost doubling the electrical load between 1972 and 1978, and/table [a] showing substantial increases in peak electrical loads at substations in the area.

Chapter Four of the draft EIS discusses alternatives to MPC's proposed 161 kilovolt transmission line as a whole including expansion of MPC's Madison hydroelectric plants, upgrading and additions to existing transmission facilities, and underground transmission lines. Chapter Six includes an analysis of environmental impacts on the Upper Madison/Lower Ruby valley.

We note what the federal courts have said with regard to environmental impact statements under the National Environmental Policy Act. In Trout Unlimited v. Morton, supra, the Ninth Circuit Court of Appeals stated:

> "That is, in our opinion an EIS is in compliance with NEPA when its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information." 509 F.2d at 1283.

In Life of the Land v. Brinegar (9th Cir. 1973), 485 F.2d 460, 472, the court addressed what kind of consideration of alternatives is mandated by NEPA:

> "NEPA's 'alternatives' discussion is subject to a construction of reasonableness. N.R.D.C., Inc. v. Morton, supra, 458 F.2d at 834. Certainly, the statute should not be employed as
>
> a crutch for chronic faultfinding. Accordingly, there is no need for an EIS to consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative. Id. at 834. Rather, the EIS need only set forth those alternatives

- 8 -

'sufficient to permit a reasoned choice.' _Id._ at 836."

While it would have been preferable if the environmental impact statements in this case had separately considered the need for the facility in the Upper Madison/Lower Ruby valleys and alternatives thereto, the basic information to enable the Board to reach an informed decision was before the Board. The EIS's substantially complied with the mandates of MEPA and provided the Board "with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project," _Trout Unlimited_, supra. We find no grounds for reversal or modification of the Board's decision in our limited review under section 2-4-704, MCA, discussed above.

Appellants' next claim is that the EIS's fail to adequately address the need for, and alternatives to, the proposed facility at Big Sky contending that there was no investigation of the basis of MPC's projected load which would justify additional electrical transmission service. Appellants reason that analysis of conservation alternatives is required by both the Siting Act and NEPA, citing section 75-20-503(1)(a) and (f),MCA, and two cases, Environmental Defense Fund v. Corps of Engineers (5th Cir. 1974) 492 F.2d 1123 and Libby Rod and Gun Club v. Poteat (D.C. Mont. 1978), 457 F.Supp 1177, aff'd in part and rev'd in part (9th Cir. 1979), 594 F.2d 742. Sections 75-20-503 (1)(a) and (f), MCA, provide as follows:

> "Environmental factors evaluated. In evaluating long-range plans, conducting 5-year site reviews, and evaluating applications for certificates, the board and department shall give consideration to the following list of environmental factors, where applicable, and may by rule add to the categories of this section:
>
> "(1) energy needs:
>
> "(a) growth in demand and projections of need;
>
> ". . .
>
> "(f) conservation activities which could reduce the need for more energy;

We have reviewed the nature of the project in <u>Corps of Engineers</u>, supra, as outlined in both the Fifth Circuit Court opinion and the District Court opinion (348 F.Supp. 916) and fail to see how the case either supports or weakens appellants' position. <u>Corps of Engineers</u> involved challenges to the Tennessee-Tombigbee Waterway, a <u>navigation project</u>, extending from Demopolis, Alabama, to the Tennessee River. Nowhere do we find discussion regarding electrical transmissions facilities and projected loads. Although the court rejected the Corps' defense that the development of alternatives need only take place where a project involves detrimental environmental impacts, we do not find that statement dispositive here.

<u>Poteat</u>, supra, involved the proposed construction of additional electrical generating units ("LAURD") at Libby Dam. In the District Court opinion, Judge Murray addressed the Corps' projected load forecasts and the conservation alternative:

> "The peak-power deficit forecasts relied upon by the Corps reflect the years 1974-75, yet LAURD was not projected for completion until 1982-83. The current forecasts for the early 1980's, as projected by Bonneville Power Administration (BPA) and the Pacific Northwest Utilities Coordinating Council show a surplus of peaking power and a shortage of base-load power, even without LAURD.
>
> ". . .
>
> "The reference to the alternative of conservation is much too conclusory. The Corps discusses the importance of conservation, but dismisses it as a viable alternative to LAURD, saying 'there is not at present sufficient evidence to warrant delaying the on-line dates of Libby Additional Units.' Recent studies by the BPA and the General Accounting Office indicate there is evidence to conclude that conservation in the Pacific Northwest will have a considerable impact. This information should be explored and analyzed in greater depth by the Corps in preparing a new EIS." 457 F.Supp. at 1188-89.

The Department justifies its failure to conduct an independent investigation of MPC's load projections by stating that, in 1975, the Department determined that its legal mandate did not extend to denying increased electrical energy to Montana consumers on the basis of the ultimate use of the electricity, or to setting a maximum amount of / electrical energy that existing

electric consumers may consume. The Department concedes, however, that it has, subsequent to 1975, refined its procedures such that the concerns raised by appellants would be addressed. Additionally, applicants are now required, by Administrative Rules of Montana, section 36.7.304(1)(b)(ii) and (b)(B) to provide to the Department the assumptions underlying load growth projections and how conservation measures may eliminate the need for the proposed facility:

> "36.7.304 CONTENT OF APPLICATIONS FOR ELECTRIC TRANSMISSION LINES AND GAS OR LIQUID TRANSMISSION LINES An application for a facility defined in subsections 75-20-104(10)(b) and 75-20-104 (10)(c) of the Act which is an electric transmission line or gas or liquid transmission line shall contain the following:

> " . . .

> "(b) Applications for electric transmission lines not based solely on transient stability considerations shall include the following:

> " . . .

> "(ii) 10-year historical and 10-year projected load growth data at each point of distribution in the area needing additional facilities. These data shall be provided in tabular and graphic form. Projections of load growth shall include a description of the assumptions used in making the projection. This shall include, but not be limited to, assumptions about: population growth; changes in electrical use per household; industrial, commercial, and agricultural use of electrical energy and power; economic conditions affecting industrial and commercial activity; conservation; and renewable alternative energy use. The effect upon demand of changes in the average price and rate structure for electric energy shall be assessed.

> " . . .

> "(B) An explanation shall be given of the effects of the applicant's energy conservation or promotion programs, if any, on past and present energy consumption rate and on future energy growth rates. The applicant shall assess the potential for conservation and a reduction in promotional activities for reducing or eliminating the need for the proposed facility. The application shall include a discussion of the consistency of the proposed facility with state, regional, and national energy and conservation policies and programs;" (Emphasis added.)

The alternatives, in addition to conservation, that

- 11 -

appellants contend were not sufficiently treated by the EIS's include on-site diesel generating facilities, waste heat sources, wind power, solar power and the use of more insulation. Although the Department might be well advised to look behind any load growth projections to determine their validity and legitimacy because an applicant's projections may very well be self-serving to a certain degree (to justify the proposed project), failure to do so is not fatal in this case, as MPC's load projections did not form the basis of the Board's decision.

We further note that, in the final EIS, the Department specifically states that MPC's load projections did not control its decision and discusses the discrepancy between the projections and actual need:

"The Department is not basing its decision regarding the need for an additional line to Big Sky on the accuracy of the applicant's load projections for Big Sky. A comparison of Table 2, which contains the historical peak load data for Big Sky, with Big Sky projections shown in Table 3-7 of the Draft EIS (page 23) demonstrates that growth is not occurring as projected. Table 2 data indicate that the peak load for winter 1975-1976 will likely be about 9048 KW, the same as the 1974-1975 winter peak. The projected values from Table 3-7 of the Draft EIS were 10,950 KW for winter 1974-1975 and 12,455 KW for winter 1975-1976. With respect to comparisons between the actual Big Sky peak loads and the applicant's projections, the applicant has stated:

"'The construction schedule of Big Sky must be considered when analyzing load projections. The estimates prepared by Mr. Hildreth (of MPC) were based on information supplied by Big Sky which showed construction of over 700 condominium units and over 50 residences by the 1975-1976 season. The Draft Impact Statement, Clyde Park-Dillon, on Page 21, indicates that 37 homes have been built to date and 564 condominiums built to date. (MPC March 15, 1976).'

"The precise timing of development at Big Sky and the final peak load to which it will grow are not certainties. However, the major consideration at present is that additional transmission capacity to Big Sky is already needed." ( Emphasis added.)

In the final EIS in the instant case, we note the Department did address the need for additional power at Big Sky:

"With respect to Big Sky, Department studies indicate that Big Sky peak demand has in the past reached the capacity of the existing 69 KV line. Table 3-1 on page 13 of the Draft EIS lists the capacity of the Big Sky-Bozeman line as 9 MW. Table 2 contains the historical Big Sky peak demand data supplied by the applicant. The Big Sky load at the Jack Rabbit substation, which is the total Big Sky load (MPC March 15, 1976), was 9048 KW in December 1974, December 1975, and January 1976. Because the capacity of the existing line has been reached, and because growth in electrical demand will continue at Big Sky, the Department must recognize the need for additional transmission capacity to Big Sky." (Emphasis added.)

The final EIS also reflects that other alternatives were

examined:

"The need for additional transmission capacity to Big Sky, which the Department in this case acknowledges, does not necessarily indicate a need for new transmission lines. Other alternatives exist: addition of voltage compensation equipment, upgrading the existing line by increasing conductor size while retaining the existing voltage level, and rebuilding the existing line at a higher voltage level. Neither of the first two of these alternatives would provide sufficient capacity to meet the peak projected long-term demand at Big Sky, nor would a combination of the two. Their implementation would therefore mean unnecessary additional expense to all Montana Power Company electrical consumers. Either upgrading the existing line to 161 KV or building a new 161 KV line would result in less energy loss during transmission (see page 59 of the Draft EIS), and provide capacity beyond the projected maximum peak power demand of 32 MW at Big Sky. Construction of a new 161 KV transmission line

is the most appropriate alternative, however, to meet the need for the additional transmission capacity (see Section I.C.3.)." (Emphasis added.)

For the foregoing reasons we hold that the Environmental
                                   not
Impact Statements in this case are/grossly insufficient as a

matter of law in their treatment of the need for and alternatives

to the proposed transmission line. The primary function of the

EIS is to provide the decision-maker with environmental reports

sufficiently detailed to allow a knowledgeable judgment and to

allow public feedback in the development of that information.

We cannot say that the Board's decision was arbitary, capricious

or clearly erroneous in view of the EIS's and documents that it

- 13 -

had before it.

Appellants next attack the EIS's on the grounds that they failed to address or discuss the alternative of a second 69 KV line going through the Gallatin Canyon in addition to the existing one. Appellants contend that this alternative came into being when it developed during the hearings that the additional 15 megawatts projected by MPC was to serve only peak demands at peak times of the year. Hearings officer Andriolo suggested the possibility of two 69 KV lines to the Board in the September 16, 1977, hearing.

In the draft EIS, we find there is consideration of higher kilovolt lines being routed from the Bozeman-Hot Springs substation through the Gallatin Canyon to Big Sky. The Department found, however, that sole reliance on one substation would present reliability disadvantages (in case of an outage at that substation) which would not be present in a transmission line from Dillon to Ennis to Big Sky. Two 69 KV lines from Bozeman to Big Sky would suffer the same infirmities as a higher kilovolt line along the same route.

The Dillon area receives its power from three different sources and, in an emergency, Big Sky could be served by the Madison hydro plant near Ennis. In case of an outage at any one substation, electricity from the other areas could be drawn upon to prevent a total power failure. The fact that the EIS's did not specifically consider the possibility of a second 69 KV line through Gallatin Canyon does not render them insufficient as a matter of law. Again, it is not required that an agency perform an exhaustive study of every possible alternative:

> "What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." NRDC v. Morton (1972 D.C.Cir.), 458 F.2d 827, 836.

Appellants further contend that the Department should have addressed the "no action" alternative in considering MPC's pro-

posed alternative.

It is clear that agencies must consider the "no action" alternative, see Poteat, supra, and Life of the Land v. Brinegar, supra. However, this claim of appellants is similar to that attacking the Department's purported acceptance of MPC's load projections and our response thereto is relevant here. It is clear that the Department has correctly reversed its earlier position in that it now considers ways that the need for a proposed facility can be eliminated, ARM, section 36.7.304(1)(b)(ii) & (b)(B), supra. Here the Department implicitly determined that the "no action" alternative would not be satisfactory, as in the final EIS this/is/stated.

> "The current need for additional electricity at Big Sky has been established, and according to the Big Sky Master Plan, the corporation desires increased development, and, hence, increased electrical consumption." (Emphasis added.)

Appellants next challenge the EIS's on the ground that they do not contain an adequate cost/benefit analysis, viz., the Department should have considered the relative costs and benefits of the proposed facility in comparison with available alternatives. Appellants quote House Joint Resolution No. 73 which provides in pertinent part.

> "That all agencies of State government are hereby directed to achieve forthwith the full implementation of the Montana Environmental Policy Act including the economic analysis requirements of Sections 69-6504 through 69-6514 . . . and

> "BE IT FURTHER RESOLVED, that economic analysis shall accompany environmental impact statements as required by the foregoing Sections of the act and shall encompass an analysis of the costs and benefits to whomsoever they may accrue, including considerations of employment, income, investment, energy, the social costs and benefits of growth, opportunity costs and the distribution effects . . ."

A joint resolution is not binding as law on this Court, but we give it consideration as a clear manifestation of the legislative construction of MEPA. State v. Toomey/ 135 Mont. 35, (1959), 335 P.2d 1051; State ex rel. Jones v. Erickson/ 75 Mont. 429, 244 (1926),

- 15 -

P. 287.

The cost-benefit analysis required by MEPA, as construed by the legislature, encompasses a broad consideration of several factors categorized in House Joint Resolution No. 73, approved March 16, 1974. A reasonable cost-benefit economic analysis undertaken pursuant to these criteria would, in effect, accomplish most of the purposes sought to be served by an environmental impact statement.

Appellants concede, however, that the Department's draft EIS undertakes an analysis of the indirect costs and benefits of MPC's proposal although not of the type appellants suggest.

Neither the Siting Act nor MEPA explicitly requires such type of analysis. It should also be noted that after the draft EIS appeared, the Department promulgated rules which require EIS's prepared by the Department to include the following:

> "(e) economic and environmental benefits and costs of the proposed action (if a benefit-cost analysis is considered for the proposed action, it shall be incorporated by reference or appended to the statement to aid in evaluating the environmental consequences);

> "(f) the relationship between local short-term uses of man's environment with the effects on maintenance and enhancement of the long-term productivity of the environment;"

MPC argues that MEPA does not require a formal and mathematically expressed cost-benefit analysis, citing Cady v. Morton (9th Cir. 1975), 527 F.2d 786.

On this point we hold there has been sufficient compliance with MEPA so that the EIS is not insufficient as a matter of law. Although this area could have been more fully explored by the Department in preparing the EIS, the EIS's, when viewed in their entirety, sufficiently apprised the Board members of the project's cost and benefits to enable the Board to render a knowledgeable decision.

-16-

Appellants next charge that a deficient EIS cannot be rendered sufficient by reference to the record outside the documents. The trial court concluded that " . . . the entire Siting Act process and the Board's decision based upon the entire record is the functional equivalent of an Environmental Impact Statement."

Since we have held that the environmental impact statements are not insufficient as a matter of law, we need not address nor determine the issue of functional equivalency. In sum, we hold that the record before us establishes that the Board's decision was not clearly erroneous, arbitrary or capricious; that substantial evidence supports the Board's findings and order; and that appellants rights were not substantially prejudiced! We observe that tested by hindsight, it is not uncommon to uncover technical shortcomings in an environmental impact statement or to point out areas therein that might have been investigated or analyzed in more detail. However, where appellant's rights are being prejudiced by substantial deficiencies in an EIS, it is no less an obligation of appellants to spell out in some detail such deficiencies to enable the Department to correct the same prior to the Board hearing and adjudication which was not done here. Otherwise the whole process of certification would be needlessly drawn out and postponed to the point that such certification would become economically prohibitive, a mockery, and illusory.

With regard to the second issue (whether the Board's findings, conclusions and Certificate of Environmental Compatability and Need are statutorily adequate and supported by the evidence), we reiterate the circumscribed nature of our standard of review under MAPA. We will reverse or modify the decision below if the judgment is clearly erroneous or arbitrary or capricious or characterized by an abuse of discretion, Section 2-4-704(2)(e) & (f), MCA. In Western Bank of Billings v. Montana

- 17 -

State Banking Board (1977), 174 Mont. 331, 340, 570 P.2d 1115, 1120, we state:

"This Court has repeatedly held that its function on appeal is to determine whether there is substantial evidence in the record to support the judgment. Strong v. Williams (1969), 154 Mont. 65, 460 P.2d 90."

Appellants' contend there was insufficient evidence in the record on the need for a 161 KV line in the Upper Madison/ Lower Ruby valleys and at Big Sky; that there was no evidence to support the finding and conclusion that the proposed line and routing constituted the minimum environmental impact; that the Board failed to comply with MAPA in issuing its findings of fact, and conclusions of law; and that the Board's Certificate of Environmental Compatability and Public Need violates section 75-20-303(3), MCA, of the Siting Act.

Appellants first contend that there was insufficient evidence of need for the 161 KV line in the Upper Madison/Lower Ruby valleys. The Board's finding of need regarding this states as follows:

"Although the need for the Bozeman to Ennis and Dillon segment of the transmission facilities is not as immediate as the Gardiner-Clyde Park segments of the link, existing transmission facilities in the Ruby and Madison Valleys are reaching their capacity limits and with population growth and increased electrical demands due to intensive sprinkler irrigation a definite need exists for an additional reliable electrical transmission facility. The completion of this leg of the project also provides for a fully integrated electrical transmission system to serve the entire area. Conversion of existing facilities in the Madison and Ruby Valley areas would provide only short-term solutions that would result in economic waste. The best long-term solution to the electrical needs of the area and projected growth patterns is

achieved through a 161 KV system proposed by the applicant with the 69 KV system from Emigrant to Gardiner." (Emphasis added.)

Appellants concede that there is evidence to support the underlined portion of the above finding but argue that there is no support for the contention that a 161 KV facility is required

to meet these needs. Although there was a substantial conflict in the record concerning the amount of power actually needed in the Upper Madison/Lower Ruby valleys, there was substantial evidence to support the Board's decision. It was the function of the Board to resolve these conflicts and we may not substitute our judgment for that of the Board on the weight of the evidence on questions of fact, section 2-4-704(2), MCA. Substantial evidence supported the Board's determination that a 161 KV facility was needed in the Upper Madison/Lower Ruby valleys. The record is replete with facts indicating that the existing transmission lines were overloaded; that only a 161 KV line would provide long-term, cost-effective service and that the needs of Vigilante Electric Cooperative which used MPC electrical transmission lines required a 161 KV line.

Appellants next contend that there was insufficient evidence of need for a 161 KV line to Big Sky and that the evidence does not support the following findings made by the Board; that available load growth information for MPC's systems supports their forecast covering future load growth for both peak and average energy; that conservation activities will not materially reduce the demand for power in the service area; that the benefits derived from the utilization of waste heat do not outweigh the advantages of the electric transmission line; that new technologies (undergrounding, on-site generation, solar energy, wind power and total energy systems) have not reached a point where they present a feasible economic and environmental alternative to the proposed facility; and that there are no viable sources of alternative energy.

We disagree. We hold there was substantial evidence to support the Board's findings.

The Board's finding No. 17 contains underlying facts (which were before the Board) from which the Board could conclude that there will be significant future development and consequent

- 19 -

electrical need at Big Sky as well as the Gallatin Canyon area as
a whole (which will also be served by the proposed line):

> "That the Big Sky Resort and Gallatin Canyon
> area can be considered as a separate area for
> growth consideration and projections. Big Sky's
> master plan shows a projected 2,700 condominiums
> and 1,263 lots. At present, only 21% of the
> condominiums are constructed and 52% of the lots
> are developed while not all of the .condominiums
> have been sold or are in use. In addition, Big
> Sky is based on an 'all electric' concept and
> electricity is needed for the hostels, medical
> center, fire department, restaurants and other
> commercial facilities as well as the ski lift,
> swimming pools and golf course. While growth of
> the Big Sky facility has declined considerably
> due to the economic market, future growth can be
> anticipated of a substantial nature. In addi-
> tion to the Big Sky resort, satellite develop-
> ments such as ICBI which has purchased 45 acres
> and has an option on 111 acres near Big Sky
> plans 200 residential condominiums, together
> with shopping and commercial facilities. In
> view of this activity, additional development in
> the Gallatin Canyon area can also be
> anticipated." (Citations omitted--emphasis
> added.)

In finding No. 18, the Board noted that the projections had twice
been revised due to adverse economic conditions but stressed the
increased needs of the Gallatin Canyon area and other areas adja-
cent to Big Sky.

Next, there was substantial evidence adduced at the
hearing from which the Board could conclude that conservation
activities would not materially reduce the demand for power.
Appellants urge that twice as much insulation could cut the
heating load at Big Sky in half. However, one witness stated
that the Big Sky condominiums were better insulated than most
Montana buildings. From the design plans of Big Sky, which were
contained in the draft EIS, the Board could have reasonably
concluded that conservation practices at Big Sky had progressed
to such a point that more of such practices would not materially
reduce the need for more power.

The Board made the following findings with regard to the
use of waste heat and on-site electrical generation:

> "20. On-site generation by a gas turbine

- 20 -

generator or diesel power generation with utilization of waste heat has been proposed by the Montana Wilderness Association as an alternative for a power line to Big Sky. Fuel costs for on-site generations would be fourteen times as much as fuel costs associated with production of electricity at a central station such as Colstrip. Further, on-site generation would not relieve the reliability problems which would be relieved by a loop system coming in from the Ennis area and connecting with the existing line up the Gallatin Canyon. Nor would it have the benefit of serving the related developments in the area such as ICBI and other developments in the Gallatin Canyon area. Although utilization of waste heat appears to be a feature that should be considered in future developments, the benefits to be derived therefrom in connection with the Big Sky project are not so significant as to outweigh the advantages of the electric transmission line.

"21. In view of the energy crisis in the petroleum industry it is not felt that on-site generation would be a feasible long-term alternative. Major emphasis is being placed upon utilization of electrical power without the undue consumption of our natural petroleum resources and on-site diesel or gas turbine generating facilities would be detrimental to this policy. Coal would not serve as a feasible alternative for on-site generation due to the transportation requirements and environmental problems encountered in an area of this type by the utilization of coal for the production of electrical energy. No available hydroelectric site exists in the general area." (Emphasis added.)

In finding No. 28, the Board found that, although new technologies such as undergrounding, solar and wind power might be used to minimize adverse environmental effects, the development of the same had not reached a point where they presented a viable economic alternative to MPC's proposed facility.

These findings were supported by evidence of fuel costs from which the Board could have concluded that on-site generation was not a financially feasible alternative. Similarly, evidence that waste heat in a total energy system is used in downtown Manhattan and in several buildings in Missoula does not require the Board to accept that method as desirable at Big Sky and therefore reject the proposed transmission line. The same reasoning obtains for the alternatives of solar and wind power as well. Appellants related attack on the Board's findings that

- 21 -

there are no viable sources of energy to replace that which would be provided by the electrical transmission line is disposed of by these considerations also, i.e. the Board is not bound to recommend that Big Sky use alternate sources of energy because others have used them successfully.

Appellants further challenge the findings relating to the route for the transmission line with the least amount of adverse environmental impact. The Board found that on the Bozeman to Ennis to Dillon segment of the line, the preferred corrider route was that of the applicant's, while on the Big Sky segment of the line, the Ennis-Jack Creek-Big Sky corridor was the most preferred route, the Ennis-Cedar Creek-Big Sky corridor the next most preferred corridor and the Gallatin Canyon route, from Bozeman to Big Sky, the third most preferred route. Appellants claim that such findings are either unsupported by the evidence or entirely contrary to it.

We disagree. For example, the Board had before it evidence showing the Gallatin Canyon area was more highly populated than the Jack Creek or Cedar Creek area. Thus a bigger transmission line through Gallatin Canyon area would be viewed by more people and be aesthetically less pleasing. The Board also had before it charts and statements showing the number and duration of outages that had occurred at Big Sky in recent years and the fact that any transmission line through Gallatin Canyon would probably use the Bozeman-Hot Springs substation. Thus an outage at that substation would have a considerably greater impact on Big Sky than if the resort were served by another energy resource as well, i.e. electricity coming from the Dillon/Ennis area through Jack Creek or Cedar Creek. The draft EIS contains additional support for the Board's conclusion favoring MPC's proposed route from Bozeman to Dillon.

Appellants next argue that the Board's findings and conclusions fail to comply with sections 2-4-623(1),(3),(4), MCA,

- 22 -

of MAPA which provide:

"Final orders -- notification --availability. (1) . . . Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

". . .

"(3) Each conclusion of law shall be supported by authority or by a reasoned opinion.

"(4) If, in accordance with agency rules, a party submitted proposed findings of fact, the decision shall include a ruling upon each proposed finding."

Appellants contend that the findings are in violation of section 2-4-623(4), MCA, because all parties here submitted proposed findings of fact and conclusions of law and the Board did not explicitly rule on each finding and each conclusion. This argument exalts form over substance. We do not construe the statutes so narrowly or technically. To do so would place an onerous burden on the Board, especially when it is remembered that usually these types of hearings involve multiple parties representing various interests and each party normally submits its own findings and conclusions. The findings and conclusions here implicitly rule on the findings and conclusions submitted by the parties and we find them to be sufficient in this case.

Moreover we have previously held that section 2-4-623(4), MCA, does not require a separate, express ruling on each required finding as long as the agency's decision and order in such proposed findings are clear, Montana Consumer Counsel v. Public Service Commission and Montana Power Co. (1975), 168 Mont. 180, 541 P.2d 770.

Appellants also claim that a number of the Board's findings merely "parrot" several sections of the Siting Act without setting forth the underlying facts, in violation of section 2-4-623(1), MCA, supra. We agree that some of the findings do track several statutes in the Siting Act. This alone does not

-23-

render them insufficient provided the underlying factual basis is apparent. While each finding is not immediately followed by the supporting underlying facts, when the findings and decision are viewed as a whole, it will be seen that the findings are adequately factually supported. It would be an unnecessary and idle act to remand for correction of any technical deficiency where the record discloses an underlying factual basis for each finding. The law does not require idle acts. Section 1-3-223, MCA.

Appellants contend that each of the Board's conclusions of law are not supported by authority or by reasoned opinion and therefore violate section 2-4-623(3), MCA, supra. We disagree. Again, while it is true that each conclusion of law is not immediately followed by an authority or opinion, such is not required. The conclusions here are sufficiently supported by reasoned opinion to render their basis reasonably ascertainable. These conclusions are supported by the findings of fact which we have previously approved.

Appellants' also argue that the Board's Certificate of Environmental Compatability and Public Need violates section 75-20-303(3), MCA, which provides:

"(3) Any certificate issued by the board shall include the following:

"(a) an environmental evaluation statement related to the facility being certified. The statement shall include but not be limited to analysis of the following information:

"(i) the environmental impact of the proposed facility;

"(ii) any adverse environmental effects which cannot be avoided by issuance of the certificate;

"(iii)problems and objections raised by other federal and state agencies and interested groups;

"(iv) alternatives to the proposed facility;

"(v) a plan for monitoring environmental effects of the proposed facility and
"(vi) a time limit as provided in subsection (4),

during which construction of the facility must
be completed;

"(b.) a statement signed by the applicant
showing agreement to comply with the require-
ments of this chapter and the conditions of the
certificate."

While the pages of the Certificate itself do not comply
with the above statute, we note that, in the second paragraph,
the Certificate fully incorporates by reference the Board's
findings, conclusions and order. Taken together these two docu-
ments fulfill the requirements of section 75-20-303(3), MCA,
supra.

Directing our attention to the third issue, appellants
argue that they were denied the due process guarantee of a fair
and impartial tribunal because of Sabol's participation in the
proceedings both as a board member and a hearing officer.
Appellants allege that Sabol had a pecuniary interest in the out-
come of the case because he was retained as legal counsel by Ski
Yellowstone, Inc., during his term of chairman of the Board of
Natural Resources and Conservation. Appellants claim this
created a conflict of interest in that whatever the Board decided
in connection with providing additional electrical transmission
facilities and services to Big Sky would establish a precedent in
any future facility siting request concerning Ski Yellowstone, Inc.

Appellants' second ground for Sabol's alleged bias
involved a newspaper article on February 15, 1976. In the
article Sabol was quoted as saying that some environmental groups
were losing credibility by opposing all development projects and
MWA was specifically mentioned. The article appears below:

"SOME ENVIRONMENTAL GROUPS
LOSING CREDIBILITY, SABOL SAYS

By Larry Wills
Chronicle Staff Writer

"The Chairman of the Board of Natural Resources
has charged that some environmental groups are

losing credibility in opposing all development
projects.
    Joe Sabol, a Bozeman attorney, and head of the
volunteer state board that reviews all major
utility construction charged that some groups
are automatically opposed to all developments no

matter how good or bad they may be.

'I think it is time that these groups re-assess their positions on some proposals,' he said.

'Some proposals are good, and some are not, but they are opposed to all projects, and are creating a polarization of attitudes,' Sabol charged.

The attorney said the opposition to all projects is a loss of perspective and concentrates on the 'trivia' that surrounds a project.

Sabol made his charges during an informal press conference concerning demands that he resign his resource board position due to conflict of interest.

The charges from the Montana Wildlife Federation and the Montana Wilderness Association stemmed from Sabol's working for the Ski Yellowstone development, and also sitting as chairman of the resource board.

Sabol said flatly he saw no conflict, and would not quit until he believed there was a conflict of interest.

He said he did not take the job as Ski Yellowstone attorney until he was assured that the position was not in conflict, and that the project itself was satisfactory in his own mind.

He also said he received assurances from the governor that the two positions would not be in conflict.

Sabol also said the Ski Yellowstone issue has never come up at board meetings, and that no Ski Yellowstone official has ever approached him as a member of that board.

The attorney was asked to quit his post in letters that the MWA and Wildlife group sent to Gov. Judge.

Sabol defended the resort as one that is better than most in alleviating bad environmental effects, and said the proposal should be recognized for its accomplishments.

Referring to two environmental groups' opposition of the resort, Sabol said, 'They can't find anything wrong with the merits of Ski Yellowstone, so they attack the people.'

The letters were sent to Judge after Sabol wrote the governor and Wes Woodgerd, head of the Fish and Game Commission objecting to 'propaganda' against the resort planned on the north shore of Hebgen Lake.

Sabol objected to a grizzly bear presentation which the attorney said implied the resort would interfere with the bears' habitat. Sabol charged there is no proof that the Hebgen area is habitat for the bear.

Also questioned was a Fish and Game employee's 'free lancing' articles while on the state payroll. The attorney referred to articles printed in a Denver paper against the resort.

The net result of the three-year delay for the resort, Sabol said, is that it is driving other

developers out of the state. The proposal is still under study by the Gallatin National Forest.

'The legislature and the environmentalists have done what they set out to do, minimize

development,' he said." (Emphasis added.)

Appellants also claim that during a recess in the Board hearing on September 24, 1976, Sabol instructed the attorney for the Department of Natural Resources and Conservation not to cross-examine the witnesses for MWA because its counsel was trying to make a record for appeal. Appellants argue this demonstrates actual bias on the part of Sabol.

We note that Sabol participated as hearings officer for the Board from April 10, 1976, to September 1, 1976. During this period two preconference hearings were held on April 10, 1976, and May 12, 1976. At the second prehearing conference, Rick Applegate, a MWA and EIC member, filed an affidavit seeking disqualification of Sabol as a hearing office and member of the Board considering MPC's application. On September 1, 1976, Sabol removed himself as hearings officer but declined to remove himself as a member of the Board. The Board voted unanimously to deny the attempted disqualification.

Appellant cites Withrow v. Larkin (1975), 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712, for the proposition that the constitutional due process guarantees apply to administrative agencies as well as the courts. While it is true that language supporting that premise appears in Withrow, the actual holding of that case involves the question of whether the Wisconsin Doctors Examining Board had the power to investigate unprofessional conduct as well as adjudicate it. Nowhere in Withrow do we find any facts similar to the case at bar, i.e., where the alleged bias of one of the decision makers is at issue.

Appellant also cites Taylor v. Hayes (1974), 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897, for authority that actual bias is unnecessary and that the appearance of bias is sufficient. The facts in Taylor were that at the conclusion of a Kentucky murder trial, the presiding judge sentenced one of the lawyers to four and one-half years in prison for nine counts of contempt

- 27 -

occurring during the trial and barred him from practicing before that court. The Supreme Court found that to so rule without a notice and hearing violated the lawyer's procedural due process rights. The court also found that the lawyer's contempt trial should be before a different judge because the original trial judge had become embroiled in a running controversy with the lawyer.

This Court has stated its position clearly with regard to biased decision makers:

> "[It is] this court's desire to zealously guard the right to fair and impartial hearings. It is not necessarily the _fact_ of bias that concerns us but the _possibility_ that bias might exist . . .
>
> "[W]e do warn . . . all administrative boards and tribunals that they should zealously guard against any appearance of unfairness in the conduct of their hearings." State ex rel. Fish v. Industrial Accident Board (1961), 139 Mont. 246, 248-49, 251, 362 P.2d 852, 853, 855.
> Inc.
> Accord, Graham v. Tree Farmers/(1963), 142 Mont. 483, 385 P.2d 83.

Nonetheless, the holdings both in _Graham_ and _Fish_, supra, state that substantial rights of the aggrieved party must have been prejudiced before the court will censure an administrative board for the conduct of a hearing. The Supreme Court in _Graham_, supra, stated:

> "We are constrained here, while disapproving the use of Mr. Wood as a hearings officer, in view of the preponderance of proof in this record, to _fail to see where any different result could be reached and for that reason we feel the error to be such that it does not call for a reversal and further hearings so far as the claimant is concerned._ (Emphasis added.) 142 Mont. at 497, 385 P.2d at 90.

In taking a closer look at the possible influence of Sabol's activities on the Board's ultimate decision, we find the following: Sabol presided at the first prehearing conference on April 10, 1976, at which time the routing and need for the transmission lines as well as witnesses and discovery were discussed among the various lawyers. Sabol also presided over

- 28 -

the second prenearing conference on May 12, 1976. At this conference the lawyers exchanged witness lists and discussed depositions, the order of appearance of the parties and deadlines for exchanging interrogatories and written statements. During the summer of 1976, the Department moved to bifurcate the hearing into two hearings. Also, both MWA and MPC moved to have the Board view the Gallatin Canyon area and MWA added the Ennis to Big Sky route as well. All three motions were argued at the September 1, 1976, hearing and the motions to view were granted but the motion to bifurcate was denied.

It was at this September 1 hearing that Sabol removed himself as hearings officer with Andriolo being substituted for him. The actual hearings on the issuance of the Certificate of Environmental Compatability and Public Need took place on September 23 and 24, 1976. It was during a recess at the September 24 hearing that Sabol allegedly told the Department attorney not to cross-examine the MWA witnesses. Sabol's term as a Board member expired on December 31, 1976.

On February 9, 1977, Andriolo issued an order that all parties' proposed findings of fact and conclusions of law be submitted by March 1, 1977, with arguments thereon on April 21, 1977, before the Board. On September 16 and October 28, 1977, the Board discussed and approved Andriolo's findings and conclusions. The statutes relating to the Board's and hearings examiner's duties are set out below:

> "(9) At the conclusion of the hearing, the hearing examiner shall declare the hearing closed and shall, within 60 days of that date, prepare and submit to the board and in the case of a conjunctive hearing, within 90 days to the board and the board of health or department of health proposed findings of fact, conclusions of law, and a recommended decision." Section 75-20-220(9).

> "75-20-301. Decision of board--findings necessary for certification. (1) Within 60 days after submission of the recommended decision by the hearing examiner, the board shall make complete findings, issue an opinion, and render a

decision upon the record, either granting or
denying the application as filed or granting it
upon such terms, conditions, or modifications of
the construction, operation, or maintenance of
the facility as the board considers
appropriate."

While we do not approve of the alleged directions not to
cross-examine the MWA witnesses, we fail to see how, on the
record before us, the Board would have reached a different result
had Sabol removed himself entirely from the proceedings, Graham,
supra. He did not participate in the Board's deliberation or
discussion of the final decision, as evidenced by
sections 75-20-220(9) and 75-20-301(1), set out above. Under these
statutes the Board's deliberations occur after the hearings exa-
miner submits his proposed findings and conclusions and a recom-
mended decision. This was done in 1977, after Sabol's term on
the Board expired.

The Board's decision was not rendered until October 26,
1977, and carried with four Board members voting in favor of
MPC's application, one member against it, and the chairman did
not vote. We fail to see how Sabol's alleged bias prejudiced the
substantial rights of the appellant.

Similarly, we fail to see how Sabol's connection with Ski
Yellowstone, Inc. resulted in the appellants' receiving any less
than a fair hearing and decision. The argument that a "prece-
dent" will be set by granting MPC its transmission lines to Big
Sky is tenuous at best and the fact that a developer must bear
the first cost of conservation alternatives in lieu of additional
electrical transmission facilities does not persuade us that
Sabol had a pecuniary interest in the present proceedings.

With regard to the newspaper article appearing in the
Bozeman Daily Chronicle, we note that none of the cases cited by
appellants (which deal with a member of a hearing panel criti-
cizing a party already before it) are on point in the instant
case. Here Sabol's comment appeared February 15, 1976, and the

- 30 -

first prehearing conference was not until April 10, almost two months later. They do not reflect any prejudgment of the issues placed before the Board in this case.

Appellants argue that Sabol improperly interfered with the conduct of the September 24, 1976, hearing by the alleged ex parte contact in the lobby during one of the recesses with Department of Natural Resources and Conservation attorney MacIntyre. However, the depositions of Doug MacIntyre and Applegate indicate that appellants wanted the DNRC to conduct "friendly cross-examination", i.e. the MWA and DNRC occupied similar positions in the proceedings and were aligned on the corridor issue--both advocated the existing Gallatin Canyon corridor rather than the Jack Creek/Cedar Creek route. We have previously held that no substantial rights are prejudiced by a hearing officer's decision to limit cross-examination to those issues on which routes are adverse, because the "cross-examination" of nonadverse parties in reality becomes just more direct examination. Northern Plains, supra.

Although neither party has raised the issue, section 75-20-220(1), MCA, merits some discussion. That statute provides in part:

> "75-20-220. Hearing examiner--restrictions--duties. (1) If the board appoints a hearing examiner to conduct any certification proceedings under this chapter, the hearing examiner may not be a member of the board, an employee of the department, or a member or employee of the department of health or board of health."

Under this statute, a hearing examiner may not be a member of the Board and Sabol was chairman of the Board at the time he was appointed hearing examiner. However, close examination of the enactment of the above statute and the facts of this case reveal that the statute did not apply to this proceeding.

MPC filed its application on June 6, 1974, for a 161 KV line from Clyde Park to Dillon. On June 30, 1975, MPC filed an amended application increasing the total mileage of transmission

- 31 -

under the amended application, lines requested and/the line was to consist of the five segments set out at the beginning of this opinion. The Department, by letter dated May 30, 1975, agreed to treat the amended application as relating back to the original (June 6, 1974) application. That letter contained the following statements:

> "The project application shall . . . be deemed to have been filed on June 6, 1974. . . [T]he Department . . . will not treat the amended applications as constituting a substantial change and, therefore, will not treat the amended applications as a new application. . ."

Section 75-20-220(1) was included as part of the amendments to the Utility Siting Act and it was expressly provided that those amendments would only apply to applications received by the Department after January 1, 1975. 1975 Laws, Ch. 494, § 25. MPC's application was filed on June 6, 1974, and, due to the relation back discussed above, the amended application was deemed to have been filed on that date also. Thus the statute is not applicable to the proceedings here.

Furthermore, the parties and the hearing examiner agreed that they were operating under the Utility Siting Act and not the amendments thereto. In the transcript of the third preconference hearing conducted September 14, 1976, we find the following interchange:

> "HEARINGS EXAMINER: . . .
>
> "Now the first thing, it is my understanding that everybody is agreed that the hearing will be conducted under the provisions of the Utility Siting Act of 1973 rather than the Major Facility Siting Act which was enacted in 1975, I believe. Is that correct?
>
> "MR. WALSH [representing MPC]: That is correct.
>
> "HEARINGS EXAMINER: And how about you, Bill? Is that agreeable to you?
>
> "MR. MADDEN [representing MWA]: That is correct.
>
> "HEARINGS EXAMINER: And how about you, Jim? Is that agreeable to you?
>
> "MR. MOORE [representing American Fork Ranch]: Yes."

In the transcript of the September 23 hearing we also find this:

> "HEARINGS EXAMINER:   Thank you, Mr. Sabol.   This
> is a hearing under the Utility Siting Act of
> 1973, and the proceedings under this, at this
> hearing will all be in conformity with that par-
> ticular Act."

For the above reasons, it is our opinion that section
75-20-220(1),/did not apply to these proceedings.
                MCA,

     Affirmed.


_____
Chief Justice

We concur:

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, deeming himself disqualified, did
not participate.

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent. The draft environmental impact statements are grossly inadequate for failure to analyze need and explore alternative sources for satisfaction of need.

Montana's Environmental Policy Act (MEPA), section 75-1-201, MCA, 1981, requires preparation of an environmental impact statement concerning the following matters:

(1)  the environmental impact of the proposed actions;

(2)  any adverse environmental effects which cannot be avoided should the proposal be implemented;

(3)  alternatives to the proposed action;

(4)  the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity;

(5)  any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The Montana Major Facility Siting Act recognizes that certain utility "facilities," as defined by the Act, have an effect upon the environment to the extent that construction is prohibited "without a certificate of environmental compatibility and public need" acquired pursuant to the provisions of the Act. Section 75-20-102, MCA, 1981. Section 75-20-301(2), MCA, of the Act provides that a certificate of environmental compatibility and public need may not be approved by the Board of Natural Resources, except upon a finding and determination by the Board of, among other things:

(1)  the basis of need for the facility;

(2)  the nature of the probable environmental impact;

(3)   that the facility represents the minimum adverse

environmental impact, considering the state of

available technology and the nature and economics

of the various alternatives;

(4)   each of the criteria listed in 75-20-503.

Section 75-20-503, MCA, enumerates more than 60 environmental factors to be studied in determining whether a proposed facility should be approved.  That section requires, in part, that the following be considered: energy needs including growth in demand and projections of need; availability and desirability of alternative sources of energy in lieu of the proposed facility; conservation activities which could reduce the need for more energy.

The Facility Siting Act imposed upon the Department of Natural Resources the responsibility for undertaking technical studies and evaluations of the statutorily mandated environmental factors.  Section 75-20-503 and 75-20-216(4), MCA, 1981. The Department of Natural Resources has the responsibility to formalize its technical studies in an environmental impact statement which it must file with the Board, to be used by the Board in making findings and determinations required under section 75-20-301, MCA.

The "report" required of the Department of Natural Resources under the Facility Siting Act, section 75-20-216(4), MCA, serves as the basic technical and evidentiary document upon which the Board must rely in making its findings and determinations under section 75-20-301, MCA, as to whether a certificate should be granted or denied.  Any substantial deficiencies in the required documents should invalidate the Board's findings and decision.

Both the Siting Act and MEPA require the Department's

draft and final environmental impact statements to consider the need for alternatives to the proposed facility. In this case, the environmental impact statements make no attempt to consider either the need for or alternatives to a 161 KV facility to service Montana Power Company's projected electrical demands in the Upper Madison/Lower Ruby Valleys.

The DEIS did not adequately study the need for, and alternatives to, a 161 KV facility at Big Sky, Montana. The existing 69 KV line servicing Big Sky has a capacity of 9 megawatts which could, with modification, be increased to a maximum capacity of 12-15 megawatts. In its application for a certificate to construct the 161 KV transmission line to Big Sky, Montana Power Company submitted that such a facility was needed to serve projected electrical loads at Big Sky of 30 megawatts. A 161 KV line has a carrying capacity of 200 megawatts. The Department's draft environmental impact statements accept Montana Power Company's load growth projections without question. Neither document makes any attempt to evaluate the basis of the projected load. There is no analysis of the types of energy demands at Big Sky which are expected to increase and, therefore, which could justify additional electrical transmission service. Such an analysis is critical. Energy demands for heat are not constant. They occur only during the winter and are heaviest only at certain times of the day. Furthermore, energy demands for heat do not require electrical service in that they can be met through other lower grade energy sources, including better conservation practices. These matters were not studied.

The evidence produced at the hearing before the Board of Natural Resources disclosed that all but 5 megawatts of required electrical power could be met through conservation

alternatives not requiring additional electrical service.
5 megawatts is well within the capacity of on-site diesel
generation or a smaller transmission line.  A 161 KV line,
with a carrying capacity of 200 megawatts, 195 megawatts in
excess of that actually needed at Big Sky, seems clearly to
not be needed.  The failure of the draft environmental
impact statements to address the actual need and existing
alternatives renders them totally deficient.

The District Court recognized the gross inadequacies in
the draft environmental statements but held such deficiencies
to not constitute a basis for reversal of the Board's decision.
The District Court said "that the entire siting act process
and the Board's decision based upon the entire record is the
functional equivalent of an environmental impact statement."
No authority is cited for this proposition.

The Facility Siting Act requires that "the Department
shall make a report to the Board which shall contain the
Department's studies, evaluations, recommendation and other
pertinent documents resulting from its study and evaluation
. . ."  Section 75-20-216(4), MCA, 1981.  The function of
the statement is to perform technical analysis and provide
expert documentation to the Board because the Board lacks
technical expertise to perform this function itself.

The Federal Courts have refused to adopt the rationale
here adopted by the trial court.  In Environmental Defense
Fund, Inc. v. Froehlke (8th Cir. 1972), 473 F.2d, 346,
the Corps. of Engineers argued that although discussion of
alternatives in its EIS was deficient, the EIS should be
considered sufficient when viewed against the entire record.
In rejecting this argument, the 8th Circuit Court of Appeals
said:

"The Corps. argues that despite these omissions, its impact statement should be considered sufficient because 'at every step of the way, from preauthorization studies through detailed project planning, which includes recent environmental and mitigation studies, the voices of fish and wildlife interests have been heard, considered and reported to Congress.' We disagree. Nothing less than a complete impact statement can serve the important purposes of section 102(c)(iii) of MEPA. As the District of Columbia Circuit Court stated in Natural Resources Defense Counsel, Inc. v. Morton, 458 F.2d 827, 834 (D.C. Cir. 1972), 'it is the essence and thrust of EPA that the pertinent Statement serve together in one place a discussion of the relative environmental impact of alternatives.'

". . .

"A statement which includes a detailed discussion of all reasonable alternatives to a proposed project and their effects [case citation omitted] insures that agency officials will be acquainted with the tradeoffs which will have to be made if any particular line of action is chosen."

The rationale adopted by the District Court to render the DEIS deficiencies harmless error, has the effect of nullifying the statutory requirement for environmental impact study.

Unlike the District Court, the majority here attempts to defend the DEIS as adequate. Not even the Department which prepared the statements can defend them. The majority admits:

"The Department, in its briefs to the District Court and to this Court, acknowledges that the EIS's contain no adequate consideration of alternatives to a 161 KV line serving the Upper Madison/Lower Ruby Valleys. The Department justifies this omission by stating that MPC failed to comply with the Siting Act and the rules adopted pursuant thereto in identifying in MPC's application the need for a facility to serve the demand in the Upper Madison/Lower Ruby Valleys."

The majority then proceeds to gloss over the deficiencies in a style that approaches advocacy. Apparently, the law now will forgive and approve the Department's deficiencies

that result from omissions in the Utility's application. The decision here has established a precedent which substantially weakens the Facility Siting Act and tends to judicially erode the environmental protection assurances afforded by the Montana Legislature.

I view the course of action now being taken by this Court to be premised upon expediency. It is true that the process is cumbersome but had the Montana Power Company made a complete application, and had the Department of Natural Resources thereafter rendered draft environmental impact statements in conformity with law, these problems would not have arisen. By this decision we reward the wrongdoers.

I register a strenuous dissent.

Justice

Mr. Justice Daniel J. Shea, dissenting:

I join in the dissent of Justice Morrison. Because of time exigencies, I am unable to write a more detailed dissent at this time, other than what I state below. Time permitting, I will add a more detailed statement of why I dissent.

The situation is that MPC has been permitted, without a showing of need or of alternatives, to expand the power available to Big Sky from a 69 KV line to a 161 KV line, in a situation where even in the untested application, the MPC has projected that Big Sky will need only 30 KV.

The current 69 KV line to Big Sky has a capacity of 9 megawatts. With modification, this line could be increased to a maximum capacity of 12-15 megawatts. The application of the MPC, accepted without question by the agency responsible for the environmental impact study (the DNRC), projects a need at Big Sky of 30 megawatts. This 30 megawatt projection was not substantiated by the MPC application, nor did the environmental impact study make any attempt to justify the load growth projection to 30 megawatts. Yet the MPC application is for a 161 KV line--which has a carrying capacity of 200 megawatts, or almost five times the projected load growth stated in the application.

As stated by Justice Morrison, all but 5 megawatts could, as disclosed in the hearing, be met through application of conservation alternatives which do not require additional electrical services. How, then, can the environmental impact statement be sufficient when it fails to address the need and the existing alternatives to the projected energy demand of Big Sky? It was error, as Justice Morrison points out, for the District Court to hold that the environmental impact statement could be given life by instead looking to

the "Board's decision on the entire record," including the deficient environmental impact statement. Justice Morrison correctly concludes, on the other hand, that the environmental impact statement must stand on its own, and here it cannot stand.

Nor can I understand the total failure of the DNRC to demand from MPC, that it comply with the information required to be in an application for a permit. Here the DNRC admitted that the MPC application was deficient, and that it did nothing to make the application sufficient. Rather, the DNRC proceeded with the environmental impact study without ever obtaining and evaluating either the need for the 161 KV line or the alternatives to supplying power for the projected needs of Big Sky.

The fault in not making an adequate application can be laid directly at the doorsteps of the MPC. But the DNRC should not have started its environmental impact study until it had a complete or substantially complete application. Furthermore, if the study was started without noticing this rather glaring omission, once noticed, it was the duty of the DNRC to notify the MPC to complete its application and to further notify the MPC that the study could not be finished until the application was complete and the DNRC had evaluated the additional information provided in the application. Here that was not done. Rather, the DNRC proceeded with the study without ever compelling the MPC to comply with the clear directives of the Montana Environmental Protection Act as to alternatives (section 75-1-201(3), MCA) and need (section 75-20-102(1), MCA). The DNRC can hardly be said to have been protecting the constitutional rights of Montana

-41-

citizens to a clean and healthy environment when it made its impact study without directing the MPC to comply, and without itself complying with these statutes. Nor did the District Court or this Court fulfill its duty by approving an environmental impact statement so glaringly deficient.

Daniel J. Shea
Justice