No. 97-525

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 196

KENNETH L. ULRICH,

Petitioner and Appellant,

v.

STATE OF MONTANA, ex rel.,

BOARD OF FUNERAL SERVICE,

Respondent and Respondent.

APPEAL FROM: District Court of the Seventeenth Judicial District,

In and for the County of Phillips,

The Honorable Ted O. Lympus, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kenneth L. Ulrich, *Pro Se*, Malta, Montana

For Respondent:

Carol Grell, Special Ass't Attorney General, Department of

Commerce, Helena, Montana

Submitted on Briefs: June 25, 1998

Decided: August 11, 1998

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶ **Kenneth L. Ulrich, appearing** *pro se*, **appeals from an order of the Seventeenth Judicial District Court, Phillips County. The order upheld the Board of Funeral Service's (Board) revocation of Ulrich's mortician's license and its order that Ulrich may not petition the Board for reinstatement of that license until completion of all terms of his criminal sentence, including full payment of the restitution ordered by the district court. We reverse and remand with instructions.**

¶ **We frame the issues as follows:**

¶ **1. Is a criminal conviction conclusive evidence of unprofessional conduct and**

sufficient grounds for revocation of a mortician's license pursuant to § 37-19-311, MCA (1993)?

¶ 2. If a criminal conviction is not conclusive evidence of unprofessional conduct, did the Board abuse its discretion and violate § 2-4-621(3), MCA, when it revoked Ulrich's mortician's license?

¶ 3. Was it an abuse of discretion to exclude the testimony of several witnesses whose testimony allegedly supported Ulrich's claim of rehabilitation?

¶ 4. Did the Board err when it held that Ulrich may not petition for reinstatement of his mortician's license until completion of all terms of his criminal sentence, including full payment of restitution?

## BACKGROUND

¶ Ulrich was a licensed mortician. He originally received his mortician's license in 1976, which subsequently lapsed. Upon application to the Board in 1993, his license was reinstated. On October 20, 1993, after the Board had already reinstated his license, Ulrich pleaded guilty to eight counts of felony forgery and six counts of felony theft in connection with unlawful transactions he engaged in as a licensed insurance agent from 1989 through 1992. On December 16, 1993, the district court sentenced Ulrich to ten years in the Montana State Prison for those crimes. The sentence was suspended subject to numerous conditions, including the conditions that Ulrich obtain employment and that he make restitution in the total amount of $125,800 to the victims of his offenses.

¶ On December 8, 1994, the Board issued a "Notice of Proposed Board Action and Opportunity for Hearing." The Department of Commerce (Department) had proposed that Ulrich's license be revoked based upon his felony convictions. The matter went to a hearing on July 31, 1995, before a hearing examiner from the Montana Attorney General's office. Based upon the criteria set forth in § 37-1-203, MCA, the issues to be decided at the hearing were:

1. Was Ulrich was convicted of criminal offenses which relate to the public health, welfare, and safety as it applies to the licensed occupation of mortician? The Department had the burden of proof on this issue.

2. If the Department met its burden of proof with respect to the first issue, had Ulrich been sufficiently rehabilitated so as to warrant the public trust? Ulrich had the burden of proof on this issue.

3. If the hearing officer determined that disciplinary treatment of Ulrich was required, what was what was the appropriate disciplinary measure?

¶ **The hearing examiner heard testimony from Ulrich, a former investigator for the Montana Insurance Department, the Department's expert mortician, Ulrich's probation officer, and the Phillips County Attorney. Based upon the witnesses' testimony, he rejected the Department's proposal to revoke Ulrich's license. Instead, on August 28, 1995, the hearing examiner entered a proposed order that allowed Ulrich to retain his license to practice mortuary science. In so doing, he cited §§ 37-1-201 and -203, MCA, and concluded that the license may not be revoked solely upon the grounds that the licensee has been convicted of a criminal offense. Rather, there must be some nexus between the conviction and the public health, welfare, and safety as it relates to the licensed occupation. In this case, he concluded that there was insufficient evidence that Ulrich was convicted of offenses that related to the public health, welfare, and safety as it applied to the licensed occupation of mortuary science.**

¶ **The hearing examiner also addressed whether Ulrich had been rehabilitated. Based upon the testimony of Ulrich's probation officer and the county attorney, and after observing Ulrich's demeanor under oath, he found that Ulrich had been sufficiently rehabilitated so as to warrant the public's trust.**

¶ **The hearing examiner served a copy of his findings of facts, conclusions of law, and proposed order on the Board. After reviewing the record, the Board held that the hearing examiner's findings were not based on competent and substantial evidence and rejected the hearing officer's proposed order. On December 4, 1995, it entered its own findings of facts, conclusions of law and final order in which it concluded that the public's health, safety and welfare will be affected if Ulrich retained his license. It additionally found that Ulrich had not been sufficiently rehabilitated. The Board revoked Ulrich's license and ordered that Ulrich may not petition the Board for reinstatement until he had completed all terms of his court-imposed sentence, including full payment of his restitution obligations.**

**¶ Ulrich filed a petition for judicial review of the Board's decision in the Seventeenth Judicial District Court, Phillips County. On August 15, 1997, the District Court entered an order granting the Board's motion for summary judgment and denying Ulrich's cross-motion for summary judgment, thereby affirming the Board's decision. Based upon this Court's decision in Erickson v. State ex rel. Bd. of Med. Exam. (1997), 282 Mont. 367, 938 P.2d 625, which had been decided after the hearing examiner and the Board reached their decisions, it held that conviction of a felony is sufficient grounds alone for license revocation. It therefore did not address whether there was a connection between Ulrich's conviction and the public's health, safety and welfare as it applied to the practice of mortuary sciences or whether Ulrich had been rehabilitated. From this order, Ulrich appeals.**

### STANDARD OF REVIEW

**¶ Section 2-4-704, MCA, sets forth the standards for judicial review of an administrative agency's decision. This Court will reverse an agency's findings, conclusions or decisions if they are:**

> (iv) affected by . . . error of law;
>
> (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;
>
> (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion[.]

Section 2-4-704(2)(a), MCA. Pursuant to these statutory standards, our standard for reviewing conclusions of law is to determine whether they are correct. Erickson v. State ex rel. Bd. of Med. Exam. (1997), 282 Mont. 367, 371, 938 P.2d 625, 628 (citing Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603). Findings of fact are clearly erroneous if they are not supported by substantial credible evidence. Erickson, 282 Mont. at 371, 938 P.2d at 628 (citing Steer, 245 Mont. at 470, 803 P.2d at 601).

¶ **When conducting a review of the Board's decision, we note that the Board, which did not personally hear or observe the evidence, does not have the authority to conduct a *de novo* review of the hearing examiner's decision. Rather it may reject the examiner's findings only if they are not based upon competent, substantial evidence. Additionally, the Board must state with particularity that the findings are not based upon competent, substantial evidence. Section 2-4-621, MCA, provides:**

> **When absent members render decision - proposal for decision and opportunity to submit findings and conclusions - modification by agency.**

. . . .

> (3) The agency may adopt the proposal for decision as the agency's final order. The agency in its final order may reject or modify the conclusions of law and interpretation of administrative rules in the proposal for decision <u>but may not reject or modify the findings of fact unless the agency first determines from a review of the complete record and states with particularity in the order that the findings of fact were not based upon competent substantial evidence</u> or that the proceedings on which the findings were based did not comply with essential requirements of law. The agency may accept or reduce the recommended penalty in a proposal for decision but may not increase it without a review of the complete record.

(Emphasis added.) A rejection of the hearing examiner's findings in violation of § 2-4-621 (3), MCA, constitutes an abuse of discretion pursuant to § 2-4-704(2)(a)(vi), MCA. Brander v. Director, Dept. of Inst. (1991), 247 Mont. 302, 308, 806 P.2d 530, 533.

ISSUE ONE

¶ **Is a criminal conviction conclusive evidence of unprofessional conduct and sufficient grounds for revocation of a mortician's license pursuant to § 37-19-311, MCA (1993)?**

¶ **At issue is whether Ulrich's license may be revoked solely based upon his conviction, or whether he is entitled to be considered in his revocation proceedings under the provisions of § 37-1-203, MCA, which provides:**

> **Conviction not a sole basis for denial.** Criminal convictions shall not operate as an automatic bar to being licensed to enter any occupation in the state of Montana. No licensing authority shall refuse to license a person solely on the basis of a previous criminal conviction; provided, however, where a license applicant has been convicted of a criminal offense and such criminal offense relates to the public health, welfare, and safety as it applies to the occupation for which the license is sought, the licensing agency may, after investigation, find that the applicant so convicted has not been sufficiently rehabilitated as to warrant the public trust and deny the issuance of a license.

¶ **The Board contends that this Court's recent decision in Erickson controls the disposition of this case, and that § 37-1-203, MCA, is not applicable to Ulrich's revocation proceedings. It urges this Court to affirm the decision of the Board and the order of the District Court on the basis that Ulrich's criminal conviction alone constitutes sufficient grounds for revoking Ulrich's license, without addressing whether his conviction related to the public's health, safety and welfare or whether Ulrich had been sufficiently rehabilitated. We reject the Board's position. Erickson is distinguishable.**

¶ **In Erickson, the Board of Medical Examiners revoked Erickson's license to practice medicine after he was convicted of knowingly and willfully filing false, fictitious or fraudulent claims for Medicare payment with the United States Department of Health and Human services. Erickson, 282 Mont. at 369, 938 P.2d at 627. At issue was whether his criminal conviction alone was sufficient grounds for revocation of his medical license or whether the Board of Medical Examiners was first required to make the determination pursuant to § 37-1-203, MCA, that the conviction specifically related to and affected the public's health, safety and welfare.**

¶ **After examining the legislative history, this Court held that § 37-1-203, MCA, did not apply to the revocation of a license. Erickson, 282 Mont. at 373-74, 938 P.2d at 629. We noted that the rationale behind the enactment of § 37-1-203, MCA, was to provide ex-offenders the opportunity to rehabilitate themselves after they had paid their debt to society. Erickson, 282 Mont. at 372, 938 P.2d at 629. We reasoned that**

**the statutory provision thus applied only to those persons with a criminal conviction seeking a license for the first time or to those seeking the reinstatement of a license after a revocation due to a criminal conviction. Erickson, 282 Mont. at 373-74, 938 P.2d at 629. In a license revocation proceeding, on the other hand, a licensee is not an ex-offender seeking the issuance or the reissuance of a license after rehabilitation.**

**¶ After holding that § 37-1-203, MCA, does not apply to revocation proceedings, this Court then examined § 37-3-323, MCA (1993), the statute pursuant to which Erickson's license was revoked. That statute serves a different purpose than § 37-1-203, MCA, and provides the criteria the Board of Medical Examiners was required to follow before revoking a medical license. It mandated by the use of the word "shall" that a medical license be revoked upon finding that the person had committed unprofessional conduct. Erickson, 282 Mont. at 373, 938 P.2d at 629. That statute provided in part:**

> (4) If the board finds that the offenses or conditions referred to in 37-3-322 [defining unprofessional conduct] . . . do exist and the person is found guilty [of an offense which includes unprofessional conduct], the board shall:

(a) revoke the person's license[.]

Section 37-3-323, MCA (1993). Conviction of a crime involving moral turpitude and the judgment of conviction was defined by statute to constitute *conclusive evidence* of unprofessional conduct as it related to the practice of medicine:

> **Unprofessional conduct**. As used in this chapter, "unprofessional conduct" means:

. . . .

> (7) conviction of an offense involving moral turpitude or conviction of a felony involving moral turpitude, and the judgment of the conviction, unless pending on appeal, is conclusive evidence of unprofessional conduct[.]

Section 37-3-322, MCA (1993).

¶ **The Court concluded that nothing in the revocation statute or the definition of "unprofessional conduct" in <u>Erickson</u> referred to additional criteria that must be considered before the medical license could be revoked. Additionally, there was no cross-reference in § 37-3-323, MCA (1993), to § 37-1-203, MCA. Hence, § 37-1-203, MCA (1993), did not apply to Erickson's case, and the convictions standing alone were sufficient grounds for license revocation. The Board of Medical Examiners was therefore not required to determine whether Erickson's criminal conviction related to and affected the public's health, safety and welfare or whether Erickson had been sufficiently rehabilitated before it revoked his license. <u>Erickson</u>, 282 Mont. at 373-74, 938 P.2d at 629.**

¶ **The Board is thus correct in citing <u>Erickson</u> for the proposition that based upon the plain language and the legislative history of § 37-1-203, MCA, that statute standing alone does not apply to revocation proceedings. However, just as the Court in <u>Erickson</u> examined the statute pursuant to which Erickson's license was revoked to determine whether § 37-1-203, MCA, was cross-referenced, we must also examine the statute pursuant to which Ulrich's license was revoked in this case.**

¶ **The version of the statute that governs Ulrich's revocation proceedings is § 37-19-311, MCA (1993). This statute, which also serves a different purpose than § 37-1-203, MCA, outlines the procedure the Board was required to follow before revoking Ulrich's license. It provides in part:**

> **Refusal, suspension, or revocation of mortician's or funeral director's license - fine**. (1) The board may . . . revoke a mortician's or funeral director's license for any of the following reasons:

. . . .

> (d) if the . . . licensee violates rules adopted by the board which define unprofessional conduct on the part of applicants and licensees.

Section 37-19-311, MCA (1993). The administrative rule that was in effect and governs Ulrich's revocation proceedings defines "unprofessional conduct" to include:

> (y) having been convicted of a felony. A certified copy of the judgment of conviction is conclusive evidence of the conviction. <u>This subsection is subject to chapter 1, part 2 of this title</u>.

Rule 8.30.701(1)(y), ARM (emphasis added). Chapter 1, part 2 of title 37 includes § 37-1-203, MCA.

¶ **Thus, unlike the revocation statute in <u>Erickson</u>, the revocation statute and the Board's own administrative rule do cross-reference § 37-1-203, MCA. Regardless of the fact that § 37-1-203, MCA, does not on its own terms apply to revocation proceedings, Ulrich is entitled to be considered under the provisions of that statute by virtue of § 37-19-311, MCA (1993), and Rule 8.30.701(1)(y), ARM.**

¶ **We hold that a criminal conviction is not conclusive evidence of unprofessional conduct and sufficient grounds for revocation of a mortician's license pursuant to § 37-19-311, MCA (1993). Before revoking Ulrich's license the Board was required to apply § 37-1-203, MCA and to determine (1) whether Ulrich's criminal conviction relates to and affects the public's health, safety and welfare as it applies to the practice of mortuary science, and (2) whether Ulrich has been sufficiently rehabilitated.**

¶ **Although the District Court granted the Board's motion for summary judgment based upon the <u>Erickson</u> decision, and although the Board urged this Court to affirm the decision on that basis, at the time the Board had rendered its decision, <u>Erickson</u> had not yet been decided. Without the benefit of <u>Erickson</u>, the Board did, in fact, apply § 37-1-203, MCA, to this case. Therefore, we now examine the record and the Board's decision to determine whether the Board's decision was proper.**

## ISSUE TWO

¶ **If a criminal conviction is not conclusive evidence of unprofessional conduct, did the Board abuse its discretion and violate § 2-4-621(3), MCA, when it revoked Ulrich's mortician's license?**

¶ **Citing § 2-4-621(3), MCA, the Board found that "certain of the hearing examiner's Findings of Fact were not based upon competent substantial evidence" and thus rejected the hearing examiner's decision. Ulrich, however, contends that the hearing examiner's findings of fact were supported by competent, substantial evidence and that the Board therefore erred when it rejected the proposed order. He argues that the Board simply "did not like" the hearing examiner's decision and thus reached its own conclusions without affording the hearing examiner's findings the proper deference. We agree.**

¶ **In reaching its own findings of fact, conclusions of law, and final order, the Board did not particularize which of the hearing examiner's findings of fact it rejected. Instead, it appears that the Board simply emphasized that evidence which supported the conclusion it desired: that Ulrich's convictions did affect the public trust as it related to the practice of mortuary science, and that Ulrich had not been sufficiently rehabilitated. A review of the record, however, reveals that all the hearing examiner's findings of fact were supported by competent, substantial evidence.**

¶ **First, the hearing examiner found that Ulrich's convictions did not affect the public trust as it related to the practice of mortuary science. In so doing, he rejected the Department's allegation that as a mortician Ulrich could easily steal from the deceased and the deceased's family by (1) stealing personal property from corpses, (2) selling funeral-related merchandise and then substituting inferior goods, or (3) diverting for his personal use funds deposited with the funeral home for pre-need funeral arrangements. In rejecting this allegation, he made several findings of fact based upon the testimony of the Department's own expert mortician. First, the hearing examiner found that stealing personal property from corpses would be difficult. Consistent with the hearing examiner's findings of fact, the expert mortician testified that 80 percent of deaths occur in hospitals or institutions, such as nursing homes. In such cases, the institution has accounted for the deceased's personal property. Before it releases the body to the mortician, the mortician must sign a personal property release slip which designates all personal property that**

accompanies the body. In cases where a person dies outside of an institution and is not under the care of a medical physician, the county coroner is responsible for the body. In such cases, the coroner accounts for the personal property before releasing the body to the mortician, and the mortician must then obtain a signature for the property release slip from the deceased's next of kin. Additionally, the expert testified that there is never an occasion when he removes a body from a home without either a coroner, a physician or family member present. Thus, although it is always possible on occasion that some personal property has not been recorded on the release slip, the property is usually accounted for before the mortician ever takes custody of the body. Because of the personal property release forms, the expert agreed that it would be easier to steal personal property from a person in a hospital while the person is still alive than after that person had died.

¶ With regard to the Department's suggestion that Ulrich could sell funeral-related merchandise and then substitute inferior goods, the hearing examiner found that the Department presented no evidence regarding the details such a transaction. He was thus unable to determine based upon the record whether a mortician could easily defraud a customer in this fashion. The record supports the hearing examiner's finding. The record reveals that the expert mortician testified that a mortician could sell merchandise to a person and then possibly substitute inferior merchandise. However, other than this one brief statement, the expert did not explain how such a transaction could occur or whether, in fact, it would be easy to defraud a customer in this fashion. No other evidence in the record explains how a mortician could easily defraud a customer in this fashion.

¶ Finally, with regard to the Department's argument that Ulrich could divert funds for his personal use that had been deposited with a funeral home for pre-need funeral arrangements, the hearing examiner found that, "it [did] not appear . . . that there is much likelihood a mortician would attempt to steal money in this fashion" and that the "Department's concern that the Licensee would divert such funds for his own personal use is speculative at best, as are the other concerns expressed by the Department." Again, the hearing examiner's findings of fact in this regard are supported by competent, substantial evidence taken directly from the Department's expert testimony.

¶ The expert explained that a "pre-need funeral arrangement" is an arrangement whereby a person purchases advance funeral arrangements. The funeral home issues

a receipt to the person upon receiving the funds and then deposits those funds with a fiduciary in a trust account, where the funds accrue interest. The funeral home is the trustee, so it is able procure those funds to apply it to pay for the person's funeral arrangements. The expert further testified that if a mortician diverted the funds for personal use instead of depositing them in an outside account, the funeral home would nevertheless be responsible for providing the funeral services when the time arose.

¶ Consistent with the hearing examiner's findings, the expert further testified that in his experience and in his community, only 20 to 25% of the funerals are prepaid in this fashion. There was no evidence on the record regarding whether funeral homes in rural communities such as Malta (where Ulrich resides) handles pre-need funeral arrangements to the extent handled by funeral homes in larger cities where the expert works, and indeed the expert testified that he believed there would be a smaller percentage of such arrangements in small, rural communities. Finally, the expert testified that a mortician could choose to operate a funeral home without ever entering into pre-paid funeral arrangements where the home receives money in advance. Ulrich himself testified that the Board could have placed a restriction on his mortician's license *prohibiting* him from making such pre-paid funeral arrangements.

¶ After reviewing the transcript of the hearing, we conclude that the hearing examiner's findings were supported by substantial evidence. In reliance upon his findings of fact, the hearing examiner concluded pursuant to § 37-1-203, MCA, that Ulrich's convictions did not relate to or affect the public health, welfare, and safety as it applies to the licensed occupation of mortician. As the hearing examiner concluded, the legislature has required that prior criminal convictions bear a close relationship to the occupation for which licensure is sought. In this case, the Department failed to meet its burden of proof.

¶ Perhaps more importantly, the hearing examiner also found that Ulrich had been sufficiently rehabilitated. Again, each finding of fact is supported by competent, substantial evidence. Specifically, the hearing examiner found that although full restitution had not yet been made, Ulrich had to date complied with all the terms and conditions of the district court's sentencing order. This finding is supported by the testimony of Ulrich's probation officer, the county attorney, and Ulrich himself. The probation officer and Ulrich testified that Ulrich has made monthly restitution payments as ordered by the district court, and the county attorney testified that

**Ulrich has apologized to the community and the victims for his actions.**

**¶ The hearing examiner also found that both the probation officer and the county attorney, who are familiar with Ulrich's crimes and his efforts to rehabilitate himself, do not expect him to be a repeat offender. The probation officer testified that Ulrich has never denied his guilt; that he is making efforts to correct his past mistakes; that Ulrich has been honest and sincere with him in their scheduled meetings; and that he does not foresee Ulrich ever reoffending. Additionally, the probation officer has monitored Ulrich's employment since his release from incarceration, and none of his employers has expressed concern over his performance, even though he has had access to or control of personal properties during such employment. The county attorney similarly testified that Ulrich has accepted responsibility for his crimes and that Ulrich has expressed concern about quickly resolving the restitution issues with his victims and had even offered to repay some of the victims by offering his services to them in lieu of money. Like Ulrich's probation officer, the county attorney also testified that he does not believe Ulrich will be a repeat offender.**

**¶ Finally, just as the hearing officer found, Ulrich gave the following testimony when asked what assurances he could provide that he would not commit similar offenses for which he was convicted:**

> Q: Now we come to the crux of the matter, the one that is your license as mortician. What safeguard is there to ensure that you won't find the same loopholes as a mortician to make the same kind of money illicitly?

> A: I'd like to think - Well, I don't like to think, I know I'm a different person today than I was even two years ago, and especially a different person than I was two years ago. I think what we're dealing with here is the opportunities aren't there, but even if they were there, I would not take advantage because, like I told you before, I'm no longer controlled by fear. I have nothing to lose anymore. I have gone as far down as anybody in my position could be at in regards to my position in the community; so the only thing I can do now is to correct for those mistakes, to show other people, perhaps, how they correct them. There is no crime to admit failure and if I could give one message to people, it would be when you find problems, admit to them, be accountable to

them, be accountable to other people as soon as that problem first surfaces.

If anything, with this opportunity, I guess I would like to use it to show people when given a second chance, one doesn't have to revert back to his old ways, one doesn't have to revert back to a life of deceit and lies, that one does have ability to seek truth and righteous living. To me, that's my priorities, that's my motivation now.

[T]o me now, the number-one priority is to be truthful and to try to correct for those mistakes and they never will be fully corrected but, yet, when you seek that, perhaps by admitting my sin, by owning the mistakes that I made, there is a chance that I will be forgiven, there is a chance that people will give that second chance.

¶ **The hearing examiner, who unlike the Board was able to observe Ulrich's demeanor under oath, found that Ulrich was "truly remorseful" for his offenses and was making a "sincere effort to atone for his crimes, to make restitution to his victims, and to avoid . . . the deceitful conduct which resulted in his convictions."**

¶ **Again, we conclude that competent, substantial evidence supported the hearing examiner's findings that Ulrich had been sufficiently rehabilitated so as to warrant the public trust. We agree with his conclusion that Ulrich should therefore retain his license. The legislature has expressly declared it to be the public policy of the state to contribute to the rehabilitation of criminal offenders by giving them the opportunity to engage in a meaningful occupation. As § 37-1-201, MCA, provides in full:**

It is the public policy of the legislature of the state of Montana to encourage and contribute to the rehabilitation of criminal offenders and to assist them in the assumption of the responsibilities of citizenship. The legislature finds that the public is best protected when such offenders are given the opportunity to secure employment or to engage in a meaningful occupation, while licensure must be conferred with prudence to protect the interests of the public.

¶ **In its decision rejecting the hearing examiner's determination, the Board concluded that licensing Ulrich would not be appropriate, because it would not be**

sufficiently prudent to protect the public. It points out that (1) Ulrich's crimes were serious, (2) that a former insurance commission investigator had testified that "in terms of victimization in white-collar crime areas . . . there is a fairly high rate of recidivism because the punishments generally aren't very severe," and (3) Ulrich had not completed the terms of his suspended sentence by making full restitution to his victims. However, whether Ulrich's crimes were serious has nothing to do with whether he has, in fact, been rehabilitated. Similarly, the investigator's testimony with regard to the rate of recidivism is irrelevant to the question of whether or not Ulrich himself has been sufficiently rehabilitated. Indeed, if the rate of recidivism alone were the criteria, no one who committed a white-collar crime could ever be considered rehabilitated pursuant to § 37-1-203, MCA, which is directly contrary to the statute and the public policy as expressed in § 37-1-201, MCA. Finally, whether or not a person has made full restitution to his victims is not conclusive proof of rehabilitation, as this Court addresses further in the fourth issue of this opinion. The Board identified no one with personal knowledge of Ulrich's rehabilitation efforts, who had indicated that Ulrich had not been rehabilitated. In any event, as already addressed, the hearing examiner's findings with regard to Ulrich's rehabilitation were supported by competent, substantial evidence. Although there is no *guarantee* that Ulrich will never commit another crime, based upon the hearing examiner's findings of fact and the testimony on the record, we conclude that the interests of the public will be best served at this time by allowing Ulrich to retain his license. Ulrich should be given a second chance to engage in the occupation of mortuary science.

¶ We thus hold that the Board abused its discretion and violated § 2-4-621(3), MCA, when it rejected the hearing examiner's findings and revoked Ulrich's license to practice mortuary science.

ISSUE THREE

¶ Was it an abuse of discretion to exclude the testimony of several witnesses whose testimony allegedly supported Ulrich's claim of rehabilitation?

¶ During the course of the July 31, 1995, hearing, Ulrich sought to introduce the testimony of witnesses whom he insists would further support his claim that he had been rehabilitated. Specifically, he attempted to introduce the testimony of District Judge John McKeon, who was the county attorney when Ulrich was prosecuted, and the testimony of his employers since his release from incarceration: the

superintendent of Malta Public Schools, the owner of Hould Farm and Ranch, and the manager of the Malta Seed Company. Ulrich contends that the hearing examiner should have allowed those witnesses to testify. Moreover, because the Board now claims that the hearing examiner's findings are not supported by competent, substantial evidence, he essentially argues that the Board should have remanded the case back to the hearing officer for the submission of this additional testimony that could supply additional competent, substantial evidence on the rehabilitation issue.

¶ However, because this Court has already held that the hearing examiner's findings of fact were supported by competent, substantial evidence and that Ulrich should therefore retain his license, we need not address this issue.

ISSUE FOUR

¶ Did the Board err when it held that Ulrich may not petition for reinstatement of his mortician's license until completion of all terms of his criminal sentence, including full payment of restitution?

¶ In its final order revoking Ulrich's license, the Board also ordered that "Ulrich may not petition the Board for reinstatement until completion of all terms of his court-imposed sentence, including full payment of the restitution ordered by the district court." Ulrich argues that the Board's order prevents him from ever petitioning for reinstatement, because without the means to make an income as a mortician, he will never be able to fully repay his victims. He points out the irony of the situation that on the one hand the State has required him to make full restitution to his victims, while on the other hand it seeks to take away the very means he has to do so. Although we need not reach this issue, because we have already held that Ulrich is entitled to retain his license, we nonetheless address it to provide future guidance to the Board should the issue arise again.

¶ We agree with Ulrich that the Board's order is unlawful. A person whose license has been denied or revoked due to a criminal conviction pursuant to § 37-19-311, MCA (1993), is nonetheless entitled to petition the Board for reinstatement of his license and be considered under the provisions of § 37-1-203, MCA. Erickson, 282 Mont. at 373-74, 938 P.2d at 629-30. In support of such an application, the person is legally entitled to present witness testimony and other relevant evidence that will demonstrate he has been sufficiently rehabilitated. By precluding a person from even

petitioning the Board prior to the fulfillment of his sentence and payment of his full restitution, the Board has unlawfully prejudged the applicant; it has essentially held that he will not be rehabilitated absent payment of full restitution.

¶ The Board points to § 37-1-205, MCA, and argues that such an order is lawful because completion of the sentence, including restitution, is evidence of rehabilitation. The Board is correct in stating that completion of the sentence *evidences* rehabilitation, but completion of the sentence is not the *only* method by which an applicant is entitled to demonstrate that he has been sufficiently rehabilitated. Indeed, the statute itself specifically states that the fact an applicant is currently under state supervision is insufficient reason standing alone to denying licensure:

> **Licensure on completion of supervision**. Completion of probation or parole supervision without any subsequent criminal conviction shall be evidence of rehabilitation; provided, however, that the facts surrounding the situation that led to the probation or parole supervision may be considered as they relate to the occupation for which a license is sought and provided that <u>nothing herein shall be construed to prohibit licensure of a person while he is under state supervision if the licensing agency finds insufficient evidence to preclude such licensure</u>.

Section 37-1-205, MCA (emphasis added).

¶ In sum, an applicant whose license has been denied or revoked due to a criminal conviction pursuant to § 37-19-311, MCA (1993), is entitled to apply for reinstatement and he is entitled to a full hearing pursuant to the criteria in § 37-1-203, MCA. An order that a person is not entitled to petition for reinstatement of his license until he has completed all terms of his court-imposed sentence, including restitution, is unlawful.

¶ Based upon the foregoing, this Court holds that Ulrich is entitled to retain his mortician's license. The case is remanded to the District Court with instructions to enter an order accordingly.

¶ Reversed and remanded.

/S/ WILLIAM E. HUNT, SR.

We concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER