**CORE-MARK INTERNATIONAL, INC.,**
**Petitioner and Appellant,**
**v.**
**MONTANA BOARD OF LIVESTOCK and**
**MONTANA DEPARTMENT OF LIVESTOCK,**
**Respondents and Appellees,**
**and**
**DEAN FOODS d/b/a MEADOW GOLD DAIRIES,**
**and MONTANA MILK PRODUCERS**
**ASSOCIATION,**
**Intervenors.**

No. DA 13-0595.
Submitted on Briefs May 14, 2014.
Decided July 24, 2014.
2014 MT 197.
376 Mont. 25.
329 P.3d 1278.

For Appellant: **Trent N. Baker**; Datsopoulos, MacDonald & Lind, PC; Missoula.

For Appellees: **Robert Stutz**; Agency Legal Services Bureau; Helena (for Montana Board of Livestock and Montana Department of Livestock); **Jock O. Anderson**; Gough, Shanahan, Johnson & Waterman, PLLP; Helena (for Dean Foods d/b/a Meadow Gold Dairies); **Mark D. Meyer**; Ugrin Alexander Zadick & Higgins; Great Falls (for Montana Milk Producers Association).

JUSTICE RICE delivered the Opinion of the Court.

¶1 Core-Mark International, Inc. (Core-Mark) appeals the order of the First Judicial District Court, Lewis and Clark County, affirming the decision of the Montana Board of Livestock (Board) to retain the administrative rule prohibiting the sale of milk in Montana more than 12-days after pasteurization (12-day Rule). The Board held a two-part administrative proceeding regarding Core-Mark's petition to amend or

repeal the 12-day Rule. The first part was a formal evidentiary hearing conducted by an independent hearing examiner who issued a proposed decision for consideration by the Board. Following the second part of the proceeding, receipt of public comment, the Board chose not to accept the recommendations of the hearing examiner, including repeal of the 12-day Rule.

¶2 A restatement of the issues on appeal is as follows:

¶3 *1. Whether the District Court erred in concluding the administrative proceeding was not a contested case proceeding?*

¶4 *2. If the District Court did not err in concluding the proceeding was not a contested case, did it err by applying the arbitrary and capricious standard of review?*

¶5 *3. If the arbitrary and capricious standard of review applied, did the District Court err in determining that the Board's decision did not violate that standard?*

¶6 *4. Whether the District Court erred in concluding that the 12-day Rule is a valid exercise of the Board's authority?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 Core-Mark is a sales and marketing company distributing grocery products throughout the United States. Core-Mark distributes products throughout the Northwest, including Montana, from its division headquarters in Spokane, Washington.

¶8 The Board is an administrative body made up of seven members who must be active livestock producers residing in the state. Section 2-15-3102, MCA. The Board is the head of the Department of Livestock (the Board and the Department are collectively referred to herein as the "Board"), an administrative agency created by § 2-15-3101, MCA. Among other powers, the Board is authorized to "adopt rules and orders that it considers necessary or proper for the supervision, inspection, and control of the standards and sanitary conditions of ... milk and its byproducts." Section 81-2-102(1)(f), MCA.

¶9 Dean Foods, d/b/a Meadow Gold Dairies (Meadow Gold), is a domestic dairy processor. Meadow Gold owns and operates processing plants and distributes its products throughout the United States. It owns processing plants in Billings and Great Falls, and is the largest milk distributor in Montana. Montana Milk Producers Association (MMPA) is an association of Montana dairy farmers who supply milk to be processed in Montana. MMPA exists to advocate for the interests of Montana dairy farmers and the Montana milk industry.

¶10 In 1980, the Board conducted a public rulemaking proceeding to

consider adopting proposed rules "concerning the dating of milk containers for freshness." 11 Mont. Admin. Register 1603-06 (June 12, 1980). This proceeding resulted in adoption of regulations regarding the dating and sale of grade A milk in Montana. All such milk is required to be in a container marked with a pasteurized date and a sell-by date. Admin. R. M. 32.8.203(1) (2014). The sell-by date can be no longer than 12 days from the date of pasteurization. Admin. R. M. 32.8.202(2). Milk must be removed from store shelves at or before the expiration of the 12 days, Admin. R. M. 32.8.202(3), and is prohibited from being sold for public consumption when 12 days or more have elapsed since pasteurization, Admin. R. M. 32.8.202(1). These regulations do not apply to milk that is "processed for sale and sold out of state," Admin. R. M. 32.8.204(2), or to "buttermilk, eggnog, and ultra-pasteurized or aseptic processed milk products," Admin. R. M. 32.8.101(1)(c). Collectively, the requirement for the 12-day sell-by date and the restriction on sale after the 12th day is referred to as the "12-day Rule."

¶11 In 2002, Inland Northwest Dairies (Inland), the processor of Darigold milk, requested authorization from the Board to allow Inland to sell milk in Montana produced in its Spokane plant and labeled with both the Montana 12-day "sell-by" date and a processor-determined "use-by" date used on Darigold milk sold in other states.[1] The Board granted Inland the requested exemption to dual-date its products, though the exemption did not exempt Inland from the prohibition on selling milk past the 12-day sell-by date. Inland sold milk in Montana marked with both the use-by date and the 12-day sell-by date until 2008 when the Board rescinded the dual-dating exemption.

¶12 In 2008, when the exemption was rescinded, Core-Mark was the distributor of Inland's milk. Core-Mark unsuccessfully attempted to negotiate a resolution with the Board. After this effort failed, Core-Mark filed suit against the Board in Montana federal district court, challenging the validity and constitutionality of the 12-day Rule, and seeking an injunction against its enforcement. During the federal litigation, Core-Mark and the Board negotiated a settlement whereby Core-Mark agreed to dismiss the case without prejudice and instead pursue an administrative process. The nature of this administrative process is the central issue in this appeal, discussed herein. The

---

[1] The date on milk containers is generically referred to as a "code date." For clarity, we refer to the different types of dates involved in this case more specifically as either a "sell-by" date or a "use-by" date.

settlement was formalized by a written Memorandum of Understanding (MOU), which described the process as follows:

Core-Mark shall submit a petition to the Department pursuant to the process outlined in Montana law, see MCA 2-4-315, seeking modification of the 12-day Rule. The Department shall accept the petition and set the matter for hearing with an independent hearings examiner at a place, date and time mutually agreed upon by the parties. The Department shall ensure that the petition is heard in a manner that will give all interested parties the opportunity to present sworn testimony and evidence on all issues raised in the petition.

The MOU further provided that the dual-date exemption would be reinstated for Core-Mark during the pendency of the administrative process, but that the 12-day restriction on the sale of milk would be fully enforced. The parties agreed that "[i]f· either party remains dissatisfied at the end of [the administrative process and any subsequent judicial review], that party is free to pursue any remedy they believe may be available and appropriate," but the MOU did not further define the effect of the hearing examiner's proposed decision.

¶13 Pursuant to the MOU, Core-Mark filed a petition with the Board seeking amendment or repeal of the 12-day Rule on October 21, 2008. Core-Mark proposed removing the 12-day sell-by date requirement and instead imposing a requirement that milk may not be sold after a date "which does not reasonably protect the health and safety of Montana consumers." Core-Mark's proposed amendment further provided a process by which the Board could ensure the health and safety of consumers if it "reasonably determines that the processor's sell-by date determination methodology" failed to do so. It also proposed changing the requirement that all milk containers be marked with a date not more than 12 days after pasteurization to a date that was "not more than 18 days after pasteurization of the milk until such time as the [Board] determines that the processor has established ... that its sell-by date determination methodology and chosen sell-by date reasonably protects Montana consumers' health and safety."

¶14 As agreed, the Board accepted the petition and published notice of a public hearing on the proposed amendment. 21 Mont. Admin. Register 2095-98 (Nov. 12, 2009). The notice explained that the proceeding would be conducted in two parts. First, an independent hearing examiner would conduct an evidentiary hearing, during which any party who wished to present evidence could apply to become a party. The hearing was to be formal and governed by the rules of

evidence. Following the hearing, the examiner was to present a proposed decision for consideration by the Board based on the testimony and evidence heard. Second, the Board would hold a public hearing to allow all interested members of the public, whether or not they had applied to become a party and present evidence, to provide comment on the proposed amendments. Both parts of the hearing were open to the public. The notice stated that the Board "will consider equally all testimony and comment received in both parts of the hearing."

¶15 John Sullivan (Sullivan) was selected by the parties to be the hearing examiner. He conducted the evidentiary hearing over six days: March 3, 4, and 5, 2010; April 26 and 27, 2010; and November 15, 2010. Parties in the evidentiary hearing process included Core-Mark, Friends of Montana Retailers and Consumers, Inc. (Friends), the Board, MMPA, and Meadow Gold. Country Classic Dairies, Inc. (Country Classic) was originally added as a party, but withdrew from the proceeding on August 11, 2010, as a result of a corporate merger. Though not designated as a party, Darigold employees testified at the hearing. Core-Mark called eight witnesses; Friends called two witnesses; the Board called one witness; Meadow Gold called two witnesses; and Country Classic took the depositions of two witnesses. In addition to witness testimony, Sullivan considered numerous exhibits, briefs of the parties, arguments by counsel, and the parties' proposed findings of fact and conclusions of law.

¶16 Sullivan issued a 24-page proposed decision summarizing the arguments by the parties and the risks and benefits of each alternative milk-dating structure. He concluded that the Board had the statutory authority to adopt and enforce rules setting standards for the freshness of milk sold in Montana, but that the 12-day Rule "is an invalid exercise of the [Board's] authority to set standards for the regulation of milk freshness" because it "is inconsistent with [the] legislative purpose and in fact frustrates and obstructs the legislative grant of authority to regulate milk freshness." He concluded there was insufficient evidence to determine whether the 12-day Rule violates the commerce clause of the U.S. Constitution. Based on these conclusions, he recommended the Board consider (1) repealing the 12-day Rule, (2) adopting a rule "allowing milk processors to set appropriate code dates based on the testing they perform to determine the freshness, palatability, taste, odor, and safety of the milk they produce," (3) consider adopting rules setting minimum standards for testing methodologies, (4) prohibit any use of a "sell-by" date as such a date is

"ambiguous at best and misleading at worst," and (5) consider requiring milk processors who print only a date on the packaging to include "some information on their milk packaging about what the code date means in terms of product freshness." Upon receipt of Sullivan's recommendations, the Board conducted the second part of the proceeding. It reviewed Sullivan's report and took public comment on the changes proposed by Core-Mark.[2] On May 30, 2012, it voted unanimously to retain the 12-day Rule without modification. The Board did not issue any written findings or conclusions explaining why it chose to retain the rule.

¶17 Core-Mark filed a petition for judicial review of the Board's decision in district court, asserting that the administrative process was a contested case proceeding and requesting judicial review pursuant to § 2-4-702, MCA. The Board responded that its decision was made by rulemaking authority under which it had full discretion to repeal or retain the rule, and was not a contested case. Meadow Gold and MMPA (collectively Intervenors) intervened on behalf of the Board.

¶18 Following submission of briefing and oral argument, the District Court denied Core-Mark's petition. The court determined the administrative proceeding was not a contested case and therefore not subject to the judicial review process under § 2-4-702, MCA. It then determined that the Board's decision not to repeal or amend the 12-day Rule was not arbitrary, capricious, or unlawful, and was supported by substantial evidence. Core-Mark appeals.

## STANDARD OF REVIEW

¶19 The appropriate standard of review is at issue in this case, and depends upon the resolution of issue one. In a contested case, a district court or this Court may only reverse an agency's findings of fact if they are "clearly erroneous in view of the reliable, probative and substantial evidence in the whole record." *St. Personnel Div. v. Child Support Investigators*, 2002 MT 46, ¶ 18, 308 Mont. 365, 43 P.3d 305 (citing Section 2-4-704(2)(a)(v), MCA). However, where the administrative

---

[2] Though not clear from the record, it appears the Board accepted written comment submissions but did not conduct a separate hearing for that purpose. This was due to the original notice for public hearing expiring during the extended length of the evidentiary hearing. The parties stipulated to the Board republishing the notice for public comment, but without a hearing. Additionally, the Board allowed public comment at its board meetings throughout the duration of the proceedings. Though the second notice and any written comments received were not made part of the record, Core-Mark has not raised any issue specific to the public comment portion of the proceeding.

agency has utilized a hearing examiner rather than personally hearing and observing the evidence, the agency may not reject or modify the examiner's findings of fact unless they are clearly erroneous. *Ulrich v. State ex rel. Bd. of Funeral Servs.*, 1998 MT 196, ¶ 14, 289 Mont. 407, 961 P.2d 126 (citing § 2-4-621(3), MCA). The agency's conclusions of law are reviewed for correctness. *St. Personnel Div.*, ¶ 20.

¶20 ■ We review an agency decision not classified as a contested case to determine whether the decision was "arbitrary, capricious, unlawful, or not supported by substantial evidence." *Clark Fork Coalition v. Mont. Dept. of Envtl. Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482 (quotation omitted). Whether an administrative proceeding is a contested case or a rulemaking proceeding is a question of law which we review for correctness.

¶21 ■ Notwithstanding the type of proceeding, we review the validity of a regulation to determine whether the rule is consistent and not in conflict with the statute authorizing the agency to adopt rules, and whether the rule is reasonably necessary to effectuate the purpose of the statute. *Mont. Trout Unlimited v. Mont. DNRC*, 2006 MT 72, ¶ 36, 331 Mont. 483, 133 P.3d 224 (citing § 2-4-305(6), MCA).

## DISCUSSION

¶22 *1. Whether the District Court erred in concluding the administrative proceeding was not a contested case proceeding?*

¶23 The paramount issue in this case is whether the administrative proceeding was a contested case. The Montana Administrative Procedures Act (MAPA), codified at Title 2, chapter 4, MCA, sets forth procedures for different proceedings. Part 3 governs the adoption and publication of rules by an agency, while Part 6 governs contested case proceedings. Each part contains respective procedures for notice and participation. However, MAPA provides a specific procedure for judicial review of only contested cases, in Part 7. Judicial review of rulemaking proceedings is not governed by Part 7. Rather, a party may seek a declaratory judgment that an administrative rule is invalid or inapplicable under Part 5. *See* § 2-4-506, MCA. The statutory structure thus distinguishes between contested cases and rulemaking, and judicial review of these matters.

¶24 Core-Mark argues the administrative proceeding was a contested case, entitling it to judicial review under Part 7 and the broader standard of review for contested cases. The Board argues that the proceeding was not a contested case, but rather a proceeding for consideration of a rule amendment conducted under the Board's

rulemaking authority.

¶25 This proceeding was initiated as a result of the parties' settlement of the federal litigation, and the MOU expressly provided for a rulemaking proceeding:

> Core-Mark shall submit a petition to the Department *pursuant to the process outlined in Montana law, see MCA 2-4-315, seeking modification of the 12-day Rule*. The Department shall accept the petition and set the matter for hearing with an independent hearings examiner at a place, date and time mutually agreed upon by the parties.

(Emphasis added.) Core-Mark filed the contemplated petition, seeking "to amend or repeal § 32.8.202 of the Administrative Rules of Montana." In its petition, Core-Mark stated that the "Montana Board of Livestock as the department head of the Department of Livestock has the power and authority under the Montana Administrative Procedure Act, *specifically § 2-4-315, M.C.A., to accept, process, and hear this Petition by and through the administrative procedures contemplated under the aforementioned statute*." (Emphasis added.) The Board accepted the petition, as agreed in the MOU, and followed the procedures contained in Part 3 (rulemaking authority). The Notice of Public Hearing (Notice) was certified to the Secretary of State for publication in the Administrative Register as required by § 2-4-302(2)(a)(i), MCA. The Notice explained how persons may be placed on the Board's list of persons interested in its rulemaking actions as required by § 2-4-302(2)(a)(iii), MCA. The Notice provided a means for interested persons to submit their data, views, or arguments orally or in writing with more than 20 days' notice as required by § 2-4-302(4), MCA. The Notice also provides that the Board "is the decision maker on all matters. By agreement, the proposals will be given to the board for decision following the conclusion of the two-part hearing process." Core-Mark's petition for judicial review in the District Court stated that it was aggrieved by the Board's "rejecting [Core-Mark's] *rule-making petition* in a contested case proceeding."

¶26 A contested case is defined as "a proceeding before an agency in which a determination of legal rights, duties, or privileges of *a party* is required by law to be made after an opportunity for hearing. The term includes but is not restricted to ratemaking, price fixing, and licensing." Section 2-4-102(4), MCA (emphasis added). In contrast, a rule is an "agency regulation, standard, or statement *of general applicability* that implements, interprets, or prescribes law or policy ... . The term includes the amendment or repeal of a prior rule." Section

2-4-102(11)(a), MCA. Commentary has offered that, "[r]ulemaking, the quasi-legislative power, is intended to add substance to the [acts of the legislature], to complete absent but necessary details, and to resolve unexpected problems. Adjudication, the quasi-judicial power, is intended to provide for the enforcement of agency statutes and regulations on a case-by-case basis." Jacob A. Stein, Glenn A. Mitchell, & Basil J. Mezines, *Administrative Law* vol. 3, § 14.01, 14-2 to 14-3 (LexisNexis 2014).

¶27 Core-Mark's petition sought to amend or remove the 12-day date requirement entirely, a new rule that would have been generally applicable to all milk producers, not just Core-Mark. While Core-Mark could argue that the dual-dating exemption it operated under from 2002 to 2008 was personal in nature, Core-Mark did not limit its challenge to the Board's revocation of the individual exemption, choosing instead to contest the rule as a whole. Core-Mark was operating under an individual exemption to allow milk products distributed to and sold in Montana to contain both the 12-day sell-by date and a processor determined use-by date. This exemption did not allow Core-Mark to avoid the prohibition on the sale of dual-dated products after the sell-by date, regardless of the use-by date. However, through the administrative proceeding, Core-Mark sought to not only eliminate the requirement for all milk processors to use a 12-day sell-by date, but also to eliminate the prohibition on the sale of milk more than 12 days after pasteurization—far beyond what Core-Mark had been granted by the exemption. The evidence and testimony concerned the benefits and disadvantages of each dating system, including the shelf-life of milk generally and the factors associated with lengthening or shortening it, the waste of milk associated with the 12-day Rule, the possible confusion of the public regarding use of a sell-by date in Montana, and similar topics. Thus, the administrative process concerned regulations applicable to all processors of milk sold in Montana.

¶28 Core-Mark argues that the proceeding is appropriately considered a contested case because the Board was "required by law" to conduct a hearing on the matter pursuant to the MOU. However, the proceeding arose pursuant to a contractual obligation under the MOU, not as an obligation of law governing the Board's authority. Section 2-4-315, MCA, under which the parties agreed to proceed, provides that "[a]n agency *may, but is not required to, conduct a hearing* or oral presentation on the petition." (Emphasis added.) The MOU's statement that the Board "shall accept the petition and set the matter for

hearing" did not negate this statutory discretion, but merely demonstrated that the Board agreed in advance to accept the petition and hold a hearing pursuant to its discretionary authority.[3]

¶29 Citing § 2-4-702(1)(a), MCA, Core-Mark argues it is entitled to contested case review because it has "exhausted its administrative remedies before the Department and [it] is aggrieved by the Department's final decision." It thus attempts to define "contested case" as any case where a party is aggrieved by the final decision of an agency. Core-Mark overlooks the remainder of this statute which provides that "a person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final written decision *in a contested case* is entitled to judicial review under this chapter." Section 2-4-702(1)(a), MCA (emphasis added). Core-Mark also fails to consider the entire definition of "contested case," which requires the "determination of the legal rights" of "a party" that is "required by law to be made." Section 2-4-102(4), MCA. Again, this was a proceeding pursuant to the Board's discretionary authority to consider proposed amendments to generally applicable rules. It was not a legally mandatory proceeding to determine the legal rights of one party. While § 2-4-702(1)(a), MCA, refers to parties who are aggrieved by a final agency decision, nothing in this statute reflects a legislative intention to include within the definition of contested case all proceedings that aggrieve a party. Under such an interpretation, any party dissatisfied with a rule, or absence thereof, of an agency would be entitled to a contested case proceeding under Part 6 and judicial review under Part 7. Such a result is inconsistent with MAPA and our prior cases.

¶30 ▪ We agree with the District Court that the proceeding here was conducted under the Board's rulemaking authority and was not a contested case.

¶31 *2. If the District Court did not err in concluding the proceeding was not a contested case, did it err by applying the arbitrary and capricious standard of review?*

¶32 As noted above, we generally review an agency decision not classified as a contested case for whether the decision was "arbitrary,

---

[3] Core-Mark also argues that it had a due process right to a hearing under the Fourteenth Amendment of the United States Constitution. However, in the District Court, Core-Mark made only the brief statement that the 12-day Rule is "in violation of constitutional and statutory provisions," in reference to a separate issue, which is insufficient to preserve a constitutional claim. *See State v. Claassen*, 2012 MT 313, ¶ 19, 367 Mont. 478, 291 P.3d 1176.

capricious, unlawful, or not supported by substantial evidence." *Clark Fork Coalition*, ¶ 21. Core-Mark argues that even if the process was not a contested case, the arbitrary and capricious standard of review should not apply here. It notes that the cases cited by the Board and the District Court for this standard of review, specifically *Hobble Diamond Ranch LLC v. State*, 2012 MT 10, 363 Mont. 310, 268 P.3d 31, and *Johansen v. St. DNRC*, 1998 MT 51, 288 Mont. 39, 955 P.2d 653, "did not involve any administrative hearing or formal development of an evidentiary record." Because the Board chose to utilize a hearing examiner for a formal evidentiary hearing, Core-Mark argues that this case is more akin to *State ex rel. Montana Wilderness Association v. Board of Natural Resources and Conservation*, 200 Mont. 11, 648 P.2d 734 (1982), and should likewise be governed by the contested case standards of review applied there, and the hearing examiner's findings of fact and proposed decision should be given deference pursuant thereto.

¶33 However, *State ex rel. Montana Wilderness Association* indisputably involved a contested case proceeding, and nothing in that case serves to support Core-Mark's argument that every case involving a formal hearing or a hearing examiner is to be governed by the contested case standards applied there. *State ex rel. Mont. Wilderness Assn.*, 200 Mont. at 17, 648 P.2d at 738 ("the Board commenced formal 'certification proceedings' on the application, deeming the matter a contested case within [MAPA]."). Though *Hobble Diamond Ranch* and *Johansen* may have involved informal decisions without administrative hearings, we have also utilized the arbitrary and capricious standard of review in cases where hearings and/or evidentiary records were involved. *See Pennaco Energy, Inc. v. Mont. Bd. of Envtl. Rev.*, 2008 MT 425, ¶¶ 12-15, 347 Mont. 415, 199 P.3d 191.

¶34 There is no authority to support Core-Mark's argument that an administrative agency's discretionary authority with regard to making, amending, or repealing rules is cabined when it chooses to utilize formal procedures to compile evidence and propose a decision, thereby rendering the arbitrary and capricious standard inapplicable. Agencies are given discretion in determining whether to conduct a hearing on a petition for adopting, repealing, or amending a rule. Section 2-4-315, MCA ("[a]n agency may, but is not required to, conduct a hearing or oral presentation on the petition in order to develop a record and record evidence and to allow the petitioner and interested persons to present their views."). Likewise, § 2-4-302(5), MCA, provides that "[i]n the discretion of the agency, contested case procedures need not be

followed in hearings held pursuant to this section." These statutes provide wide discretion to an agency in determining whether to utilize a formal hearing procedure in its rulemaking process. Core-Mark's position is also inconsistent with the statutory provisions in Part 7 applying judicial review to only contested cases. The definition of contested case does not require that all proceedings involving a hearing examiner or formal evidentiary record be a contested case. Further, contrary to Core-Mark's argument, the rulemaking procedure utilized here is not similar to the hearing process that we reviewed pursuant to MAPA standards in *Bitterroot River Protective Association, Inc. v. Bitterroot Conservation District*, 2008 MT 377, ¶¶ 18, 25, 346 Mont. 507, 198 P.3d 219 (review of agency declaratory ruling in a proceeding by a MAPA-exempt entity was reviewed "in the same manner as decisions or orders in contested cases"), and does not control here. We decline to adopt a blanket rule extending the contested case standard of review to any case where a formal hearing was conducted. We affirm the District Court's use of the arbitrary and capricious standard of review for Core-Mark's claim.

¶35 *3. If the arbitrary and capricious standard of review applied, did the District Court err in determining that the Board's decision did not violate that standard?*

¶36 Core-Mark argues that, even under the arbitrary and capricious standard, the court erred on multiple grounds in upholding the Board's decision. First, it argues that the Board was required to issue written findings and conclusions supporting its decision, and explain why it rejected Core-Mark's evidence. Core-Mark argues that such a written statement is required by our holding in *Clark Fork Coalition*. Because the Board did not issue a written statement supporting its decision, Core-Mark argues the decision was arbitrary and capricious as a matter of law. However, we do not read *Clark Fork Coalition* to provide such a requirement in the present case.

¶37 *Clark Fork Coalition* involved a question of an agency's interpretation and application of an existing regulation, not its rulemaking process. We stated that "in examining whether an agency decision applying a regulation was arbitrary or capricious, the courts consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Clark Fork Coalition*, ¶ 27. This requirement to consider "relevant factors" specifically related to the factors mandated by the statute and regulation at issue in that case. *Clark Fork Coalition*, ¶¶ 11-13. We further held that, in the context of the enforcement of the subject

environmental regulations, the agency was required to "take a 'hard look' at the environmental impacts of a given project or proposal" and "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Clark Fork Coalition*, ¶ 47. The requirement to "articulate a satisfactory explanation for its action" was not an adoption of a general rule for all non-contested case administrative proceedings. Rather, it was a holding that, under the regulation at issue, which dictated the factors to be considered, the agency was required to "supply a statement of reasons why" the potential environmental impacts were deemed to not satisfy the regulatory definition, rather than merely providing "[a] simple statement that a perpetual discharge of polluted water will always be treated." *Clark Fork Coalition*, ¶ 48. *Clark Fork Coalition* does not require agency adoption of a statement of reasons in the context of this case.[4]

¶38 Secondly, Core-Mark argues that the decision was arbitrary and capricious because it lacked support in the evidentiary record. The standard for determining whether a decision was arbitrary or capricious is whether the decision appears "random, unreasonable or seemingly unmotivated, based on the existing record." *Hobble Diamond Ranch*, ¶ 24. Reversal is not warranted simply due to the existence of inconsistent evidence or evidence which might support a different result. *Hobble Diamond Ranch*, ¶ 24. The reviewing court must determine whether the agency considered the relevant information, or if the decision "was so at odds with that information that it could be characterized as arbitrary or the product of caprice." *N. Fork Preservation Assn. v. Dept. of St. Lands*, 238 Mont. 451, 465, 778 P.2d 862, 871 (1981). Such a review is limited, and we cannot substitute our judgment for that of the agency by determining whether or not the decision was "correct." *N. Fork Preservation Assn.*, 238 Mont. at 465, 778 P.2d at 871.

¶39 The Board, through an independent hearing examiner, undertook an extensive hearing process to gather evidence and public comment on the proposed change. The administrative record is substantial, and the hearing examiner's 24-page proposed decision details the

---

[4] There are MAPA provisions that require a statement of reasons for agency decisions in various contexts. *See e.g.*, §§ 2-4-305(1)(b)(i), 2-4-305(6)(b), 2-4-315, MCA. It does not appear that these provisions apply to the situation here, at least facially, but because an argument is not made regarding their applicability by any party, we leave that question for another day.

arguments on both sides of the issue. Though the Board did not witness first-hand the six days of evidentiary hearing, it monitored that process, receiving status updates on the evidentiary proceeding at twelve meetings between May 2009 and March 2012. The Board conducted a review of the examiner's proposed decision and of the public comments. By the March 12-13, 2012 meeting, the Board had the hearing examiner's proposed decision for nearly five months, but chose to pass the issue to its May 29-30, 2012 meeting "to allow board members more time to study the decision."[5] It is evident that the Board thoroughly considered the evidence and arguments on each side of the issue before making its decision, despite the fact that it did not preside over the evidentiary hearing itself.

¶40 From the record, it is clear that persuasive arguments were made for both maintaining the existing 12-day Rule and for adopting the dating system advocated by Core-Mark. Core-Mark presented evidence and argument that (1) the processor is in the best position to determine the shelf-life of its milk because when a processor chooses an expiration date, the consumer receives the most accurate information about the product; (2) the 12-day Rule discriminates against foreign business and inhibits out-of-state milk producers from selling in Montana because 12 days is an insufficient time period in which to distribute and sell milk; (3) the 12-day Rule results in unnecessary waste of perfectly good milk to retail stores because all parties agree that milk generally has a shelf-life of 16 to 21 days; (4) the 12-day Rule is misleading because consumers often mistake the sell-by date for an expiration date; (5) the 12-day Rule results in increased costs to consumers because it limits competition, requires frequent delivery, and causes waste; (6) the 12-day Rule creates a disincentive for Montana farms and dairies to improve facilities, equipment, and procedures to improve milk quality because the 12-day Rule arbitrarily requires the same date regardless of the actual shelf-life of the milk; and (7) the 12-day Rule prevents consumers from being able to compare the actual freshness of different brands of milk because the 12-day Rule requires the same date length for all brands regardless of

---

[5] We note that Core-Mark argues that we should not consider these meetings of the Board and the Board's consideration of the proposed rule change therein because "they are not part of the record and are irrelevant." It argues that such "nonrecord and irrelevant matters are not subject to judicial notice." We disagree that the Board's consideration of the petition is irrelevant in the face of Core-Mark's argument that the Board arbitrarily and capriciously rejected the hearing examiner's proposed decision after failing to adequately consider the evidence presented.

the milk's true shelf-life.

¶41 The contrary evidence in support of the 12-day rule included (1) the 12-day Rule ensures consumers who purchase milk in Montana will still enjoy a reasonable shelf-life for the product after purchase, thereby allocating waste to the seller rather than the consumer; (2) the 12-day Rule provides a more consistent measure of freshness to a consumer because the sell-by date currently required always indicates a date 12 days after pasteurization; (3) the rule eliminates the temptation for processors to stretch their code dates for competitive reasons; (4) the 12-day Rule better accommodates rural consumers who shop less frequently than urban residents; (5) changing the 12-day dating system to a processor selected use-by system will confuse Montana consumers who are used to purchasing milk with a sell-by date; and (6) the shelf-life of milk is highly dependent on a variety of factors which occur after the milk leaves the processing plant, such as the temperature it is stored at, making a processor-determined use-by date incapable of always accurately reflecting how long the milk will remain fresh.

¶42 ■ We cannot conclude the Board's decision to retain the 12-day Rule was "random, unreasonable or seemingly unmotivated, based on the existing record." *Hobble Diamond Ranch*, ¶ 23. Though evidence existed to support Core-Mark's proposed dating system, it is not our job on a record like this to decide whether the Board's decision was the "correct" option. Given that there was evidence to support the Board's decision, we affirm the District Court's conclusion that the Board's decision was not arbitrary or capricious.

¶43 *4. Whether the District Court erred in concluding that the 12-day Rule is a valid exercise of the Board's authority?*

¶44 Core-Mark argues that the 12-day Rule is beyond the Board's statutory authority, citing the requirements of § 2-4-305(6), MCA, that a rule be "consistent and not in conflict with the statute" and "reasonably necessary to effectuate the purpose of the statute." However, much of Core-Mark's argument focuses on the evidentiary issues discussed above, such as product waste, confusion to customers, and inflexibility, not on the Board's statutory authority to regulate milk, and we decline to revisit the evidentiary basis for the Board's decision.

¶45 Administrative agencies may only exercise the powers conferred upon them by the Legislature. When the agency's authority to create a rule is challenged, we look to the statutes to determine whether there is a legislative grant of authority. *Bick v. St. Dept. of Just.*, 224 Mont.

455, 457, 730 P.2d 418, 420 (1986). If the agency has been granted the authority to create the challenged rule, we are not tasked with "redesign[ing] the program should we find it lacking in any respect, but [must] merely determine whether or not the [agency] acted reasonably and within its delegated authority." *Bick*, 224 Mont. at 457-58, 730 P.2d at 420. "[A]dministrative regulations are 'out of harmony' with legislative guidelines if they (1) engraft additional and contradictory requirements on the statute; or (2) if they engraft additional, noncontradictory requirements on the statute which were not envisioned by the legislature." *Bd. of Barbers v. Big Sky College of Barberstyling, Inc.*, 192 Mont. 159, 161, 626 P.2d 1269, 1270 (1981) (quotation omitted). We afford an agency's interpretation of its statutory authority "respectful consideration" when its interpretation has stood unchallenged for a considerable length of time. *Mont. Trout Unlimited*, ¶ 37.

¶46 ▋ The authorizing statute at issue provides that the Board may adopt rules and orders that it considers necessary or proper for the supervision, inspection, and control of the standards and sanitary conditions of slaughterhouses, meat depots, meat and meat food products, dairies, milk depots, milk and its byproducts, barns, dairy cows, factories, and other places and premises where meat or meat foods, milk or its products, or any byproducts thereof intended for sale or consumption as food are produced, kept, handled, or stored.

Section 81-2-102(1)(f), MCA. This statute provides the Board with authority to adopt rules "it considers necessary or proper" for controlling the "standards" of milk and its byproducts. Pursuant thereto, the 12-day Rule was adopted in 1980. Determining the length of time milk can be sold after processing is clearly within the statutory authority to ensure the standards of milk, and the requirement to label milk with a date allows consumers and the Board to monitor a processor's quality and standards. Nothing about the 12-day Rule conflicts with the statutory authorization or engrafts additional requirements not envisioned by the statute. A rule to control the standards of milk offered for sale is "reasonably necessary" to effectuate the statute's purpose—regulation of the industry to control quality and safety of consumer milk products. Though the 12-day Rule may not be the *only* permissible dating system, there is no doubt that the Board had authority under Section 81-2-102(1)(f), MCA, to adopt a dating system.

¶47 "Neither litigants nor citizens can complain because an officer or

a board exercises a discretion specifically granted through legislative authority. If a power is unwisely given, it must be revoked by the same authority that gave it." *Fulmer v. Bd. of R.R. Commrs.*, 96 Mont. 22, 35, 28 P.2d 849, 853 (1934).

¶48 Affirmed.

CHIEF JUSTICE McGRATH, JUSTICES COTTER, McKINNON and WHEAT concur.